**People of the State of Illinois, Plaintiff-Appellee, v. Paul De Mario, Defendant-Appellant.**

**Gen. No. 51,403.**

First District, Fourth Division.

June 25, 1969.

Gerald W. Getty, Public Defender of Cook County, of Chicago (Marshall J. Hartman, Norman W. Fishman and James J. Doherty, Assistant Public Defenders, of counsel), for appellant.

John J. Stamos, State's Attorney of Cook County, of Chicago (Elmer C. Kissane, Robert B. Rosen and Barth H. Goldberg, Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE ENGLISH delivered the opinion of the court.

OFFENSES CHARGED

Robbery and murder.*

---

\* Ill Rev Stats (1965), c 38, § 9–1:

Murder. (a) A person who kills an individual without lawful justification commits murder if, in performing the acts which cause the death:

(1) He either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or

(2) He knows that such acts create a strong probability of death or great bodily harm to that individual or another; or

## JUDGMENT

After a jury trial, defendant was found guilty of both offenses and was given concurrent sentences of 15 to 30 years for murder and 10 to 20 years for robbery.

## POINTS RAISED ON APPEAL

(1) The State failed to prove the corpus delicti.

(2) Defendant was convicted through the use of inadmissible hearsay.

(3) Defendant was not proven guilty beyond a reasonable doubt.

(4) The court erred in admitting prejudicial and irrelevant testimony relating to the identification of a coindictee.

(5) The court erred in refusing to allow an instruction on reputation.

## EVIDENCE

James W. Henry, for the State

He is a physician, a specialist in pathology, who performed the autopsy on John A. Baird. He found extensive areas of contusion, over both cheekbones, the jaw, both front and back of the neck, the upper chest, the backs of both hands, and the right wrist. The brain was swollen, with areas of hemorrhage on both sides, evidencing concussion. In his opinion, the immediate cause of death was aspiration pneumonia, with the underlying cause being trauma from the application of force. While a fall could result in injuries of this type, the distribution of the injuries could not substantiate a fall as the cause. The brain hemorrhages did not result from natural causes such as a stroke.

---

(3) He is attempting or committing a forcible felony other than voluntary manslaughter.

Ill Rev Stat (1967), c 38, § 18–1:

Robbery. (a) A person commits robbery when he takes property from the person or presence of another by the use of force or by threatening the imminent use of force.

178

Philip Montalbano, for the State

He was a police officer who was called to 2856 N. Campbell about 5:40 p. m. on August 15, 1965. He went to the apartment of the caretaker, Mr. Baird. Baird, a small man about 5′ 5″ tall, was lying on the cot. His face had bruise marks and blood, some congealed and some still bleeding under his eye. The witness tried to question Baird, but Baird was unable to give answers, only nodding his head, so he ordered a squadrol and had him taken to the hospital. The witness talked to a Mr. Cook at the apartment, and then looked for money in the dresser drawer but found none.

Edward Curtis, for the State

He was a homicide detective on August 15, 1965, when, after a conversation with Baird who was then in the hospital, he went with the owner of the building, Mr. Grant, to Baird's apartment at about 9:00 p. m. The dresser drawers were all pulled open and objects were lying on the floor. A large amount of blood was on the bed's blanket and pillow. In the folds of the blanket, he found an eyeglass lens covered with blood. He also found a pair of glasses, bent and bloody, with one lens missing.

On August 25 he arrested Guy Ramirez * and defendant.

Sharon Smith Cramer, for the State

She had known defendant and Ramirez for approximately one month on August 15, 1965, and had seen defendant three or four times. Between 1:00 and 1:30 on that afternoon, she accompanied defendant and Ramirez to Candace Bergman's house where they picked her up and then went for a ride. She had known Candy for two years. After driving for a while, defendant said that

---

* Ramirez was tried separately, found guilty by a jury, and sentenced to terms of 5 to 10 years for robbery and 14 to 15 years for murder. These convictions were affirmed by another division of this court in People v. Ramirez, 92 Ill App2d 341, 235 NE2d 412.

the car, a Mercury, was running low on gas, so they all transferred to a Chevrolet, at which point she met another friend of the defendant, named Butch. A brief discussion ensued concerning where the three boys could get some money. Ramirez said he knew where he could borrow some. They stopped at the corner of Elston and Campbell adjacent to the building (otherwise identified as the building in which Baird was living), and defendant and Ramirez got out of the car and entered the building. The others waited in the car, double parked. Then Butch also went into the building. When they came out, walking rapidly, the witness noticed scratches on Ramirez' face which he didn't have when he went in, and defendant had a bulge in his pocket which hadn't been there before. Ramirez asked defendant how much he got and he said "fifty." She asked if they could get something to eat, and Ramirez said, "Not around here." They drove to where the Mercury was parked and all but Butch got back into the Mercury and drove to a pizza place.

On cross-examination, the witness testified that on September 10, 1965, police came to her house and told her something of what had transpired on August 15, 1965, but not everything. They did not tell her she had seen defendant that night; she told them she had seen him when she got in the car, but she couldn't believe "they would do anything like that." She then went to the station house where she made a statement to the police. After first denying that she was in the same room when Candace Bergman had given a statement, she testified that Candy was at the other end of the same room; that she couldn't hear what was said by Candy and that she "just didn't pay any attention to her." As they "drove by there" on the way to the police station, it all came back to her mind and she "remembered it." Although the witness said she did not remember it, the State stipulated

that she had previously testified (at the Ramirez trial) that Officer Mahoney had refreshed her recollection that the crime had occurred on August 15.

Candace Bergman, for the State

She had known defendant for four years and had been dating him occasionally for four months as of August 15, 1965, although she was married. On that day, defendant, Ramirez, Butch, and Sharon Smith Cramer came to her house at about 2:00 p. m. and they all went for a ride in a red Mercury, with defendant driving. Defendant mentioned something about saving gas, so they switched to a Chevy, with Butch driving. Defendant asked the girls if they knew where they could get any money, and was told that they did not. Ramirez said, "I know where we can get some money," and told Butch to drive to Elston and Campbell. First defendant and Ramirez went in, and after five or ten minutes Butch went in. When they came out they acted very nervous and kept looking around. Ramirez had a scratch on his hand and some blood. Defendant had a bulge in his pocket. Ramirez asked him how much he got and he said fifty dollars. She and Sharon were dropped off at the witness' house at about 6:00 p. m. Later, defendant came back and picked them up again.

She asked defendant if he had hurt anyone, and he said no, but the next evening he told her, "We beat up an old fellow."

Two or three weeks later, police investigating the incident came to her house. They mentioned the date of the occurrence to her and briefly explained that the old man who had been beaten was now dead. They took her to the police station and she gave a statement. All the while (two or three hours) the police were questioning her, she thought that she was being charged with a crime. She had been told that charges wouldn't be pressed if a state-

ment were made. She reiterated that she was with defendant during both afternoon and evening of August 15.

During the week following the incident she went to defendant's house, but, instead of finding him, talked to a girl living there who gave her a clipping which mentioned defendant's arrest for murder.

Henry Cook, for the State

He lived in the building where John Baird, the caretaker, was beaten. On August 15, sometime after lunch, about 1:00 or 2:00 o'clock, he saw Guy Ramirez coming into that building. At the time he didn't know his name, but he was acquainted with him because Ramirez had formerly lived in that building, they had talked to each other and had coffee together occasionally at a nearby restaurant. On August 15, as the witness was starting out the door of the building, Ramirez was coming in and they spoke to each other. Outside, he saw other people but didn't pay any attention to them, as he was in a hurry on his way to Riverview Park, and he could not identify them, or defendant, as having been one of them. He wasn't interested at the time.

Returning home at about 4:30 p. m., the witness went to the room of "Uncle John Baird" to see about paying rent. The door was open, and Baird was there in a beat-up condition, his face cut and bleeding. They had a short conversation in which Baird asked the witness not to call the police, that nothing had happened, that he had not been beaten, and that he had not fallen down the stairs. The witness, nevertheless, proceeded to telephone the police. When they came he did not tell them anything about Ramirez, but later he was taken to a lineup and identified Ramirez as having been at the building that Sunday.

Sharon Huhtala, for the State

She was living in the same apartment with Donna Hunt, Guy Ramirez and defendant on August 15, 1965. She got up about 11:30 a. m. Ramirez and defendant

182

woke up sometime between 2:00 and 3:30 p. m. and left the apartment immediately. They returned the next morning between 7:00 and 8:00 a. m., changed clothes, and went out again. On August 17, she noticed marks on defendant's arm and scratches on his shoulder. He said he received them at work, fighting with a girl. That same day she noticed some new leopard seat covers and a blinking tiger ornament in defendant's car which he said were a gift. On August 15 she had asked him for money for groceries and he had said he didn't have any, but on the 17th he paid $15 on a traffic ticket.

She and Donna were questioned by the police who told them that a 77-year-old man had been beaten up and killed, and Ramirez and defendant had mentioned their names. A few days later, "Candy" came around and inquired about defendant. She seemed surprised that he was in jail, and the witness gave her a newspaper clipping which had the names of Ramirez and defendant and the man's name, "John."

Marie Grant, for the State

She and her husband were the owners of the building in which Baird had lived and been employed by them as caretaker for 2½ years. He was 77 years old and weighed about 100 pounds.

Baird's duties included the collection of rent for the apartments. She set up receipt books for the keeping of rent records in which Baird made entries showing dates the rents would fall due and dates of payment. She would see him several times a week and usually collected the rents on Sunday or Monday, or by Tuesday. Examination of the record book disclosed that he should have had $96 for rent collected during the week before August 15.

Carl Buchner, for the defense

Defendant is Vice President of an ice cream business which operates eleven trucks. He employed defendant for four years as a driver and for odd jobs. Defendant

stocked the truck in the morning and turned in the receipts from sales at night. Defendant quit his job on August 10, 1965, to learn a trade.

He further testified:

> Based on my contact with Paul, and what I have heard from fellow-employees, I have an opinion as to his reputation for being a peaceful and law-abiding citizen. As far as I know, Paul is very liked by everyone down there, including myself; never had any problems or trouble with anyone. He was very good.

> . . . . . .

> I never discussed the defendant, Paul DeMario's reputation with anyone.

> State's Attorney: Q. Did you ever discuss Mr. DeMario's reputation for being peaceful and law-abiding, Mr. Buchner?

> A. I can't say in just those words; although at times we did say that—or I did say I was happy to have him.

> Q. What I mean is you never heard anything about his reputation, did you?

> A. No. By the same token I never heard anything bad.

> Q. Then, what you are testifying to now is really your opinion, from your own personal contact?

> . . . . . .

> A. Well, yes.

Lucille Wilson, for the defense

She saw defendant at a picnic at about 10:30 p. m. on August 15, 1965.

Paul DeMario, defendant, on his own behalf

He did not beat or rob "that old man." He was home on August 15 and did not wake up until early in the afternoon. Ramirez, Donna Hunt and Sharon Huhtala were

184

there at that time. He left the apartment with Ramirez at about 3:00 or 4:00 p. m. and they drove around until about 6:30 p. m., when they saw Candace Bergman and Sharon Smith at Candace's house. After leaving the employment of Mr. Buchner, for whom he had worked for four years, he obtained work through a day labor office, at Victor Gasket Company, but he did not work on August 14 through 18. (His testimony on this point was confusing, as later on he mentioned a different employer's name and said that he worked there on Monday [sic], August 17.) He paid a traffic ticket on August 17, but he did not buy the leopard seat covers until the 24th or 25th, the date of his arrest. He had known Ramirez for about 3 years. He did not leave his company on Sunday, the 15th; they stayed out all night and until time to go to work Monday night.

OPINION

 (1) Defendant contends that the State failed to prove the corpus delicti. The corpus delicti in a murder case consists of two elements: (a) the fact of death; and (b) that the death was caused by a criminal agency. People v. Willson, 401 Ill 68, 76–77, 81 NE2d 485. The testimony of the police officers and Dr. Henry's autopsy constituted sufficient proof of the corpus delicti in this case. This evidence supports the State's theory that the victim died as a result of a beating administered by an assailant. Where the fact of death is proved by direct evidence, the criminal agency of the defendants may be established by circumstantial evidence. People v. Hotz, 261 Ill 239, 103 NE 1007.

 There is also ample circumstantial evidence that a robbery took place, and this, too, is sufficient. People v. Fedora, 393 Ill 165, at 176, 65 NE2d 447. Both the police officer at the scene and the detective investigating the crime found no trace of money, and noted that the room was in a dishevelled state. Moreover, Mrs. Grant, the co-owner, testified that, according to the receipt rec-

185

ords, Baird should have had about $96 in rent money on August 15, 1965. This is corroborated by the testimony of the two girls, Candace Bergman and Sharon Cramer, who noticed a bulge in defendant's pocket when he came out of the building, and heard him tell Ramirez that he got "fifty."

(2) Defendant contends that he was convicted through the use of inadmissible hearsay evidence. The objection is to this testimony by Mrs. Grant:

> Q. On the basis of examining the record or receipt book on or about August 16th, did you form an opinion how much rent had been collected in the week before that?
>
> A. Yes, sir, for the apartments that were rented he should have had $96.

The record referred to was shown to have been set up by her and kept by Baird under her supervision to keep track of rentals due and their dates of payment. While this might have been sufficient foundation for admission of the record into evidence, that question need not be decided, as the record itself was not offered.

A witness may, however, testify by referring to a memorandum, even though it may not be admitted or admissible into evidence, by stating the facts as he then recalls them. Furthermore, the witness need not have prepared the memorandum. Scovill Mfg. Co. v. Cassidy, 275 Ill 462, at 472, 114 NE 181. The record does not show clearly that an objection was made to Mrs. Grant's testimony on the ground which is now raised in this court. This, of course, would in itself preclude arguing the point here. In any event, defense counsel had a right to inspect the record, and to cross-examine Mrs. Grant regarding it, and he did neither. We find in this contention no basis for reversal.

■ (3) Defendant contends that the evidence does not establish his guilt beyond a reasonable doubt, but we conclude that it does.

Defendant was placed at the scene of the crime at the time of its occurrence through the testimony of Candace Bergman and Sharon Cramer. Defendant himself said that he was in the company of Guy Ramirez throughout the entire day, and Henry Cook testified that he had seen Ramirez, with whom he was acquainted, going into the building shortly before the crime. To be sure, defendant said that his association with Ramirez did not start that day until 3:00 or 4:00 p. m., but that was not a significant discrepancy in time with the other witnesses, or, if it were considered so, was disbelieved by the jury and the court. The testimony of Sharon Huhtala, the girl who lived with defendant, added to defendant's involvement in that she noticed defendant's acquisition of money (which he did not previously have) for the purchase of seat covers for his automobile and the payment of a traffic ticket on August 17. Also, on August 17, she noticed marks on defendant's arm and scratches on his shoulder which he explained as resulting from a fight at work, yet defendant, in part of his testimony, denied having worked on August 14, 15, 16 or 17. Both Bergman and Cramer told of having noticed that when defendant came out of the building he had a bulge in his pocket which had not been there before. And they both related that, in answer to a question by Ramirez, defendant said that he had gotten "fifty." In addition, Bergman testified that the next day defendant told her, "We beat up an old fellow." Defendant urges us to question the truth of both Bergman's and Cramer's testimony in light of their admission that each was under the impression that she was threatened with arrest when initially confronted by police. The record does not bear this out as to Cramer.

187

However, both witnesses testified under oath at the trial, and the jury had the best opportunity to evaluate their credibility and the weight to be given to their testimony. The primary responsibility of the jury, rather than this court, in this regard is a proposition so firmly based in the law as to require no citation of authority.

The actions of the police officers in this situation were no more than a reasonable exercise of their duties and well within the limits of due process. People v. Miller, 13 Ill2d 84, 96–97, 148 NE2d 455. They questioned the witnesses, who were initially unclear about the details, but remembered more clearly as they were asked questions pertaining to the event.

It is also understandable why the State's witness Cook was unable to identify defendant as one of the people he observed outside the building when he had seen Ramirez going through the doorway. People v. Betts, 101 Ill App 2d 322, 243 NE2d 282, is not controlling in this factual situation.

■ (4) The defendant also argues that there was prejudicial and irrelevant testimony admitted relating to his association with a codefendant, because witness Cook was allowed to testify about having seen Guy Ramirez at the building on the day in question, and to view a photograph of Ramirez for purposes of identification. Cook knew Ramirez by sight, but not by name. The trial judge, at a conference in chambers, overruled an objection to this testimony, stating that it was admissible in substantiation of other testimony placing the two together on the day of the crime. We believe the ruling to have been correct. People v. Wilson, 1 Ill2d 178, at 188, 115 NE2d 250.

(5) Lastly, defendant contends that the court erred by refusing to allow an instruction on reputation. Defendant's employer, Buchner, testified as to his own good opinion of defendant. He also said, however, that he

had never discussed defendant's reputation with anyone, nor had he heard anything, either good or bad, about his reputation. At the conclusion of his cross-examination he stated that what he was testifying to was really his own opinion, based on his own personal contact with defendant.

 Evidence of reputation must be limited to the witness's knowledge of another person's reputation, and cannot be admitted if it shows merely the existence of favorable traits of character deduced by the witness solely from his personal knowledge and observation. People v. Willy, 301 Ill 307, 133 NE 859; People v. Reeves, 360 Ill 55, 195 NE 443. Reputation testimony, to be admissible circumstantially, must be based upon the witness's association with defendant's neighbors and friends. People v. Shelton, 388 Ill 56, 57 NE2d 473; People v. Reeves, 360 Ill 55, 195 NE 443. We conclude that the testimony of Buchner was insufficient to justify the giving of an instruction to the jury on this subject, and that the trial court correctly refused to do so.

DECISION

The judgment of the Circuit Court is affirmed.

Affirmed.

DRUCKER, P. J. and McNAMARA, J., concur.