THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JOANN CALHOUN, Defendant-Appellant.

(No. 53746;

First District—March 10, 1972.

Gerald W. Getty, Public Defender, and Hume, Clement, Hume & Lee, Ltd., both of Chicago, (Raymond P. Niro, and James J. Doherty, Assistant Public Defender, of counsel,) for appellant.

Edward V. Hanrahan, State's Attorney, of Chicago, (Robert A. Novelle and Robert C. Samko, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE ENGLISH delivered the opinion of the court:

*Offense Charged*

Two alternate counts of murder. Ill. Rev. Stat. 1967, ch. 38, par. 9—1(a) (1) and (2).*

*Judgment*

Defendant was found guilty of murder by a jury and was sentenced to a term of 16 to 30 years.

*Contentions Raised on Appeal*

1. The evidence presented at trial was insufficient to established defendant's guilt beyond a reasonable doubt.

2. Defendant was denied a fair trial due to the ineffective assistance of court-appointed counsel.

3. The prosecutor's cross-examination of a defense witness was so prejudicial as to deprive defendant of a fair trial.

*Evidence*

*Mamie Perkins,* for the State:

She is defendant's mother. She shared a third-floor apartment at 4513 S. Indiana with Anthony Guy, a witness for the defense. Living in the other apartments on the third floor of the same apartment building were defendant and Bessie Porter, the deceased.

As far as she could remember, the only other people with her on the third floor of the building at about 8:00 P.M. on March 5, 1968, were Anthony Guy, the decedent, and defendant. She was in her apartment with defendant and Anthony Guy when Bessie Porter came and stood by the door of the apartment. The witness did not speak to her, nor did she overhear any of the conversation between defendant and decedent, but she did notice that the decedent was drunk. Defendant left the apartment, but she could not recall whether or not Anthony Guy also left the apartment. When she later saw defendant in the hall together with decedent, she did not see whether defendant had a weapon in her hand. The witness did not hear the shot, but Anthony Guy told her that Bessie had been shot. She went to the deceased's apartment and saw her lying on the couch. She did not see defendant at that time. She went downstairs, notified the police officers in a nearby squad car that her daughter had killed the decedent, and directed them to the decedent's apartment.

---

* "*Murder.* (a) A person who kills an individual without lawful justification commits murder if, in performing the acts which cause the death:

    (1) He either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or

    (2) He knows that such acts create a strong probability of death or great bodily harm to that individual or another; * * *."

She then went to the door of a building across the street, but returned home when she could not locate her daughter.

*George Greenlee,* for the State:

He has been a police patrolman for approximately seven and one-half years. At about 7:15 P.M. on March 5, 1968, he and his partner, Patrolman Nealis, went to 4534 S. Indiana in response to a call regarding lost property. Upon arriving at that address, they spoke to Mrs. Emma Simms and to defendant, Mrs. Simms' daughter-in-law, about a missing derringer pistol. Mrs. Simms believed that her pistol had been taken by Bessie Porter's son. Defendant took both officers across the street to 4513 S. Indiana to point out Bessie's apartment. Defendant was present when Bessie denied that her son had taken the gun. As all four were recrossing the street to the Simms' apartment to settle the matter, Bessie saw defendant's six-year-old son playing in the street and admonished defendant for drinking instead of looking after her son. Defendant became angry, and the officers had to quiet her down. Upon returning to the Simms' apartment, there were more accusations by Mrs. Simms and denials by Bessie Porter. However, the officers saw no reason to arrest anyone at that time and ended the investigation. As they left at about 7:40 P.M., defendant was with Mrs. Simms, and Bessie was returning home.

At about 8:10 P.M., the two officers returned to that area after hearing a radio call that a woman had been shot at 4513 S. Indiana. They arrived at the scene, were directed by other officers to the third floor, and observed the deceased lying on a cot in her apartment. The officers identified the deceased as Bessie Porter, whom they had seen earlier in the evening. Also present in the room were Anthony Guy, Mamie Perkins, and another officer.

The officers crossed the street to the Simms' apartment, found the defendant in the third-floor hallway, and placed her under arrest. At the time she was arrested, defendant did not have a gun in her possession.

*Paul Nealis,* for the State:

He has been a patrolman for about ten months. His testimony as to the events in question was similar to that of his partner, Officer Greenlee. However, he further testified that he searched the Simms' apartment after defendant was arrested, and found a derringer pistol hidden in Mrs. Simms' bed and a 32-caliber seven-shot revolver in a brown bag in the freezer compartment of Mrs. Simms' refrigerator where she told him it was hidden. He examined the revolver and found that it contained one spent cartridge and one live cartridge. He later submitted the revolver to the Police Crime Laboratory for a ballistics examination. The revolver and both cartridges were introduced into evidence.

*Leroy O'Sheild,* for the State:

He has been a policeman for about ten months. On March 5, 1968, at about 7:50 P.M., he and his partner were in the vicinity of 4500 S. Indiana. He first observed Mamie Perkins as she crossed from the east side of Indiana (where her apartment is located) to the west side. He later saw her as she approached the squad car and spoke to him. He followed her to Bessie Porter's apartment and saw the decedent, wearing striped pajamas, lying face down on the couch. The pajamas were later admitted into evidence.

*Joseph Celovsky,* for the State:

He has been a firearms examiner for the Police Crime Laboratory for six years. He testified as to the results of the ballistics examinations he performed on the bullet extracted from the body of the deceased and on the 32-caliber revolver. It was his expert opinion that the bullet taken from the decedent's body was fired from the 32-caliber revolver found in the Simms' apartment by Officer Nealis. He testified that the bullet taken from the body was deformed, and stated that the deformity could have been caused if the bullet had struck some object during its flight.

*Joseph Price,* for the State:

He has been a microanalyst with the Scientific Crime Detection Laboratory for ten years. He testified to the results of the analytic test which he made on the pajamas taken from the body of the deceased. He found a hole in the lower right section of the back panel of the pajama top. The test showed that the stains surrounding the hole were blood. He identified another dark mark on the fabric as having been made by a soft bullet and the type of grease usually used as a lubricant for bullets. In response to a hypothetical question, he estimated that a bullet would have to be fired from a relatively close distance of not more than three feet in order for powder burns to be evident on a victim's clothing. He found no trace of powder particles on the pajamas.

*William Sturner,* for the State:

He has been the pathologist to the Coroner of Cook County for almost two years and he performed the autopsy on the body of the deceased. He testified that the deceased was 5'4" in height and weighed 135 pounds. The significant traumatic findings of the autopsy were limited to the right, lower back region where a bullet entry wound was found. The wound, which had a diameter of five-eighths of an inch, was circular in shape, and was surrounded by a small area of serrated skin. He found no evidence of a muzzle imprint or of powder burns. He discovered no exit wound during the external examination of the body, but, upon internal examination, located the bullet about three-fourths of an inch within the upper left part of the chest. He testified that the

trajectory of the bullet was from downward to upward, from back to front, and moderately from right to left. He estimated that the path of the bullet was at about a 50° or 60° angle. Since the bullet did not hit any bones, its path was straight.

Sturner also testified that the rate of alcoholic content in the deceased's bloodstream at the time of her death was 401 milligrams per cent ethenol. In response to a hypothetical question concerning the level of alcohol, he stated that it was likely that the deceased was under the influence of alcohol at the time of her death.

*Leroy Ranachowski,* for the Defense:

He is an investigator for the Cook County Public Defender's Office. About three months after the evening in question, he took photographs of the hallway and the bathroom on the third floor of the building located at 4513 S. Indiana. Many of the pictures showed that a small chip of wood was missing about three feet off the ground on the right side of the bathroom door.

*Anthony Guy,* for the Defense:

He lived with Mamie Perkins in the third-floor rear apartment at 4513 S. Indiana. He looked at the pictures taken by Leroy Ranachowski and identified a ¾ inch chip in the wall as having been noticed by him for the first time on the day after the shooting. It was about three feet above the floor.

On the evening in question, he was with Mamie Perkins in their apartment. Defendant, who was there with them, left the apartment shortly before a gunshot was heard. After he heard the shot—he didn't know how long—the deceased walked into his apartment and stated that she had been shot. He did not see defendant after he heard the shot.

*Joann Calhoun,* Defendant, in her own behalf:

She stated that on March 5, 1968, she was in possession of the 32-caliber revolver then in evidence. The gun belonged to John Simms, her common-law husband, but he had given it to his mother, Emma Simms, for her protection because her derringer pistol was missing. Because the derringer was found, defendant was bringing the revolver back to her apartment when she stopped in at her mother's apartment to watch television. She had to pass Bessie Porter who was standing in the doorway to Mamie's apartment. Defendant and Bessie had a conversation regarding Mrs. Simms' missing derringer and the recent episode with the police. The conversation continued after defendant sat down, holding the gun in her right hand. When defendant got up to leave, she and Bessie both stepped out into the hallway near the bathroom between the apartments. As they were facing each other, they resumed their conversation.

Defendant identified the coat she had worn that evening, and stated that as she walked past Bessie, the coat was thrown over her left shoulder, and the gun was still in her right hand. Bessie threw the coat in defendant's face, and as defendant stumbled backward, the gun went off. After the shot, Bessie walked past defendant to the doorway of Mamie Perkins' apartment and then re-passed defendant to go to her own apartment and lie down on the couch. Defendant's mother came out of her apartment and accused defendant of shooting Bessie Porter. Defendant went out of the apartment building and crossed the street to the Simms' apartment with the gun still in her hand. Defendant told Mrs. Simms that she thought she had shot Bessie. Mrs. Simms took the gun, and defendant went down the hall where she was then arrested by the police.

She had never handled a gun before that night and she had not intended to kill Bessie Porter. She knew that there were two bullets in the gun because her husband had opened the gun and shown them to her. He had also warned her to carry the gun and not to put it in her pocket.

*Opinion*

■■ Defendant's first contention on appeal is that she was not proved guilty beyond a reasonable doubt, bearing in mind that the State had the burden of proving an appropriate mental state to establish defendant's criminal agency in causing the death of Bessie Porter. *People v. De-Mario,* 112 Ill.App.2d 175, 251 N.E.2d 267; *cert.* denied, 397 U.S. 1057.

■■ The State's case included proof that there had been a verbal altercation between defendant and decedent shortly before the shooting, that the bullet found in the body of the decedent had been fired from the revolver which had been in defendant's possession, and that defendant had admitted to her mother-in-law that she thought she had shot Bessie. Proof of the existence of the death was unquestioned, but, in our opinion, proof of defendant's criminal agency in causing the death was deficient. Murder was committed if defendant either intended to kill or knew that her actions created a strong probability of death. (Ill. Rev. Stat. 1967, ch. 38, par. 9—1.) Although proof of specific intent to kill is not essential, the least that must be proved is that defendant voluntarily and wilfully committed an act, the natural result of which would be the death of another. (*People v. Latimer,* 35 Ill.2d 178, 220 N.E. 2d 314; *People v. Aarhus,* 111 Ill.App.2d 167, 248 N.E.2d 820.) The State's evidence proved only that defendant shot decedent, not that defendant killed the decedent with the requisite mental state. Defendant's explanation that the gun accidentally went off when she stumbled backward after the decedent had thrown a coat in her face would, if credible, completely

negate the evidence of intent or wilful conduct which the State sought to present.

■■ Since there were no eyewitnesses to the shooting other than defendant, the State's case was entirely circumstantial. It is well settled that where the proof is entirely circumstantial, if there is any reasonable hypothesis arising from the evidence consistent with the innocence of defendant, it must be adopted, as it is essential to a conviction on circumstantial evidence that the facts proved be not only consistent with guilt but that they be inconsistent with any reasonable hypothesis of innocence. *People v. Wilson*, 400 Ill. 461, 81 N.E.2d 211.

The jury apparently disbelieved defendant's theory, argued at trial, that the decedent was killed by a ricocheting bullet, although scientific evidence showed the bullet to have been deformed in a way which could not have occurred merely by entering the victim's body. Nevertheless, there is another hypothesis based on the facts in evidence which is so strongly consistent with defendant's innocence as to leave us with reasonable doubt of her guilt.

Those facts and resulting conclusions are: (1) Decedent was 5'4" tall, and since she was standing when the bullet entered her body in the lower back, the point of entry must have been approximately three feet off the ground; (2) since there was no evidence of powder burns on the decedent's body or clothing, the scientific evidence established that the shot must have been fired from a distance of at least three feet; (3) the medical evidence established that the bullet had entered decedent's back at an upward angle of approximately 60°; and (4) the triangulation of the upward and forward trajectory of the bullet to a point on decedent's body three feet off the ground, the 60° angle of the bullet entry, and the three-foot (or greater) distance from the decedent's body leaves no other explanation possible but that the gun in defendant's hand must have been on or very near the floor when it went off.

These facts support defendant's testimony that the gun went off as she stumbled back. Since it is more than likely that decedent turned and ran after she threw the coat in defendant's face, a bullet entry wound in decedent's back was the logical and necessary conclusion to be reached from all the evidence. The State, however, hypothesizes that defendant pointed the gun at decedent and shot her in the back as she ran away. If this had been done from as close as two feet, with both parties standing, the bullet would have passed over decedent's head by more than a foot. Because of the undisputed facts recited in the paragraph next above, this theory is without support in the evidence on account of the angle of the bullet's entry, unless the unlikely proposition be assumed that decedent was doubled over in a completely horizontal position while run-

ning away from defendant. Aside from defendant's own testimony, the only evidence as to this particular period of time is that of Anthony Guy who testified that after the shot, decedent walked into his apartment and told him she had been shot.

■■ Since there is a reasonable hypothesis arizing from the facts which is consistent with the innocence of defendant, it must be adopted. (*People v. Wilson*, 400 Ill. 461; 81 N.E.2d 211.) That the State's theory may seem to a court more probable than another which could also be supported by the same facts is not a proper basis for decision, because the probabilities one way or the other have nothing to do with the conclusion as the evidence must be so strong as to establish all the necessary elements of defendant's guilt beyond a reasonable doubt. We are not satisfied that the State met its burden to that extent.

In view of this conclusion, we need not discuss the other points raised. The judgment and sentence are reversed.

Reversed.

LORENZ, P. J., and DRUCKER, J., concur.