THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JARVIS BROOKS, Defendant-Appellant.

First District (6th Division)   Nos. 1—87—3489, 1—88—0179 cons.

Opinion filed August 24, 1990.—Rehearing denied October 1, 1990.

Randolph N. Stone, Public Defender, of Chicago (Hugh Stevens, Assistant Public Defender, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Renee Goldfarb, Walter P. Hehner, and Thomas J. Byrne, Assistant State's Attorneys, of counsel), for the People.

JUSTICE EGAN delivered the opinion of the court:

After a bench trial the defendant, Jarvis Brooks, was found guilty of murder of Hershell Comier and armed violence and sentenced to 25 years in prison. His first contention is that he was not proved guilty of murder beyond a reasonable doubt.

Robert Wilson testified that Hershell Comier (Hershell) was his niece. Wilson had known the defendant for four or five years; he knew the defendant as Hershell's boyfriend, and he and the defendant socialized together. The relationship between the defendant and Hershell ended approximately three months before September 1986; in that period Hershell developed a relationship with a new boyfriend named Tony. About four days before her death, Hershell and Tony moved to a second-floor apartment near the intersection of Adams Street and Damen Avenue in Chicago.

On September 17, 1987, Wilson and the defendant were playing basketball. Later, the defendant drove Wilson to a liquor store where Wilson bought some liquor and cigarettes. The defendant then drove to Hershell's apartment, telling Wilson that he was going to pick up Jarvina, the daughter of the defendant and Hershell. They arrived at Hershell's building between 6:30 and 7 p.m. The building had two floors with one apartment on each floor. The defendant and Wilson went to the building's front door, which was locked, and the defendant knocked. Hershell looked out her second-story window and then came downstairs and opened the door. The defendant told her that he had come to get Jarvina; Hershell said, "Okay," went back upstairs leaving the defendant and Wilson on

the first floor, and then returned with Jarvina. When Hershell returned, the defendant asked if he could use her washroom, and she said, "No." The defendant then asked if anyone else was in the apartment; she said, "No," and said that Tony had gone to take care of some business. Wilson took Jarvina to the car while the defendant stayed and talked to Hershell for no more than five minutes. Wilson did not hear this conversation. At some point, the defendant and Hershell walked up the stairway.

Hershell then called to Wilson from the second-floor window, asking him to come and get the defendant. Wilson walked through the building's front doorway, through a second doorway, and up the stairs to the second floor. The defendant was in the hallway in front of Hershell's door, which was closed. The defendant was hollering, "Hershell, Hershell, I want to talk to you," but Hershell did not answer. Wilson told the defendant that they should leave; the defendant walked downstairs and out onto the porch followed by Wilson, who closed and locked the front door behind him.

Wilson went to the car, telling the defendant, "Come on, let's go." The defendant left the car and went to the back of Hershell's building, out of Wilson's view. Between "one or two and a half minutes" later, Wilson, who was sitting in the car, heard a gunshot. Wilson told Jarvina to wait in the car and ran to the rear of the building. He went up the back stairs and saw that Hershell's back door had been kicked in. The door normally was braced by a two-by-four in a metal bracket attached to the door.

Wilson entered the apartment and saw the defendant standing with a gun in his hand. Wilson asked the defendant what had happened, and the defendant said he and Hershell were struggling when the gun went off; he said that it was an accident and indicated that Hershell was in the front room. Wilson walked into the front room and saw Hershell lying on the floor; she had been shot in the chest and was lying on her back. Wilson checked to see if she was alive, but realized she was dead. He saw two lacerations on her inside lower lip. Wilson told the defendant to give him the gun, but the defendant jerked away from him and ran downstairs. Wilson followed him to his car. The defendant said he was going to call an ambulance and drove away.

Wilson left Hershell's apartment and saw a police car in the area; he told the police what had happened. The police took Wilson back to the apartment and then rode around with him trying to find the defendant. They continued to drive around until they learned that the defendant was in custody.

Officer Lloyd Peterson testified that he was outside the front of the Eleventh District police station at approximately 8:15 p.m. on September 17. The defendant approached him and said, "I'm the one you are looking for. I just shot my old lady." Peterson took the defendant inside the station where he turned the defendant over to Officers McCaster and Calhoun.

McCaster and Calhoun left the station with the defendant to look for the weapon he had used. Acting on the defendant's instructions, they went to two garages on West Fifth Avenue, but did not find the gun on either roof where the defendant indicated that he had thrown it; these roofs were slanted. They then went to Marshall High School at 3250 West Adams. There, the defendant indicated first that he had thrown the gun onto a rooftop 1½ stories high. After McCaster climbed onto the roof and did not find anything, the defendant indicated that perhaps the gun was on another roof at the school that was three stories high. McCaster climbed onto that roof and found a .38 caliber revolver which he identified at trial. The weapon contained four live rounds and one spent shell and was missing part of its handle. The defendant told the officers that he had thrown the gun on at least two sloped roofs but that the gun fell back down to the ground. The defendant identified the gun for the officers but did not know where the handle was.

Detective Ralph Vucco arrived at Hershell's apartment around 7 p.m. The molding of the rear door had been pulled off and was lying on the floor as was a two-by-four that had been used as a brace; a metal bracket was attached to the molding.

By stipulation it was established that the bullet recovered from Hershell's body had been fired by the gun recovered by the police and identified by the defendant. The stipulated autopsy report also showed that Hershell's death was "related to the gun shot wound of the chest lacerating the internal jugular vein and brain." The report also said that there were two cuts on Hershell's lower lip.

The defendant testified that he was born in Cook County in 1965 and had 10 siblings. He graduated second in his class from Marshall High School, where he received a perfect attendance award. He worked as a food store clerk and, from February 1985 until his arrest, as a mail handler for the post office. The defendant and Hershell started dating in about 1979 or 1980, when he was 14 and she was 12 years old. In 1984 they had a child, Jarvina, and began living together in 1986. The defendant had never been arrested nor had any complaint ever been made against him for harming Hershell.

Three years before her death, he and Hershell had been separated for a month when he met and pleaded with her to get back together; at that meeting he cut his arm with a butcher knife, indicating that he would kill himself for her. The cut was not very deep, but it bled and the defendant said it left a scar. After this meeting they resumed their relationship, including going to church for Bible studies. In July 1986 they again broke up. He and Hershell twice met to discuss their relationship; during the second meeting he attempted to kill himself with a knife, but Hershell prevented him by grabbing the knife's blade. (She was not hurt.) On a third occasion, in August 1986, they met again, and he tried to kill himself by cutting his throat with a broken beer bottle; Hershell and the defendant's brother stopped him by grabbing his arm. (Again, she was not hurt.) The first week in September 1986 he met Hershell again in his mother's house; he told her that he loved her very much and no longer wanted to live without her, but nothing else happened at this meeting. On another occasion, when Hershell was not present, he thought about killing himself with a knife, but his mother told him not to do it.

At 12 noon on the day of the shooting, the defendant went to Hershell's apartment and said that he wanted to pick up his daughter later, between 5 and 5:30 p.m. He talked to Hershell outside her apartment; she did not let him inside. She had custody of the child after their separation but allowed the defendant to see the girl. He left and met Robert Wilson; they played basketball and drank with a group of about five friends, but the defendant did not become drunk. One friend asked if he could leave a weapon in the defendant's car while they played; this was the gun introduced at trial. The defendant did not mention to his friends that he was distressed regarding Hershell or that he thought of killing himself.

At about 6 p.m. the defendant left the basketball game and drove with Wilson to Hershell's apartment. When he arrived he had the gun in his waistband, and he and Wilson knocked on the front door. Wilson did not know that the defendant had the gun with him. Hershell opened the door but did not have the child with her; she went upstairs and got the child, whom Wilson took to the car; the defendant stayed for three to five minutes and talked to Hershell about their breakup. He wanted to kill himself at that time. He knew Hershell was living with someone else, but this had no effect on his state of mind. The conversation ended when Hershell said she could not talk then and went inside. He was angry when she would not talk to him. He stood in the hallway and

cried, then left with Wilson, who had come inside to urge him to leave. Wilson followed him out of the building; the defendant, however, did not know that Wilson had locked the door.

The defendant walked to the back of the building. He kicked open the rear door, forcing his way into the apartment to speak with Hershell. It did not seem to take a great amount of force to kick open the door. He was angry when he kicked open the back door and entered the apartment. He had the gun with him to kill himself, not Hershell. After he entered the apartment he and Hershell did not have an argument but sat on a sofa in the front room. He denied telling the police that they had an argument at this point; he admitted that she was mad that he had destroyed her rear door. He managed to calm her down and convinced her to sit on the sofa.

They sat side by side on the sofa; he begged and pleaded with her to come back to him or he would kill himself then and there. He put the gun, which was in his right hand, to his head and cocked the hammer; he did not have his finger on the trigger. Hershell stood up and pleaded with him not to kill himself because she loved him and there was still hope, but she said they could not get back together at that time. While she was talking, she snatched the gun from his hand. The defendant stood up to recover the gun. She turned and fell to the floor and the gun went off. He could not recall whether her hand was on the trigger. He "definitely did not tell [the police] that the gun was in [his] hand [when it fired]." Hershell was lying on her side, and the defendant turned her over, saw her gagging and became very frightened. Her chest was bleeding a lot, but he did not give her any medical care. He kneeled over her body for about 20 seconds, then left to get help. He took the gun from the floor of the apartment.

He ran downstairs and told Wilson that Hershell accidentally had been shot and that Wilson should call an ambulance and the police. He denied that Wilson came up to the apartment, as Wilson had testified. The defendant was very frightened and, about two minutes after he left the apartment, he got into his car and drove down Adams Street. He did not intend to kill Hershell.

After unsuccessfully attempting to throw the gun on several sloped rooftops, he threw the gun on a roof at Marshall High School. At this time he knew that he "had to turn [himself] in because [he] did not want to make it look like [he] was guilty." He drove to his father's house, but no one was home. He drove to his mother's house and told his brother what had happened and that he

wanted to surrender but that he was frightened. His brother encouraged him to surrender and drove him to the police station.

At the police station, his brother told him not to say anything. They met a police officer outside the station and his brother had a conversation with the officer. The defendant denied telling Officer Peterson, "I shot my old lady." The defendant went with Officer McCaster in a car to show the officer where the gun was thrown. He denied telling McCaster, "I shot my old lady" but did tell McCaster that Hershell was shot accidentally. They found the gun at Marshall High School. The defendant recalled being interviewed by two detectives at the police station who advised him of his rights. He did not recall what he told the detectives but acknowledged that it was possible that he told them he was angry when Hershell would not let him into her apartment. Although he denied ever hurting Hershell, he admitted that they had a few fights during which they would wrestle and he would unintentionally hurt her. He denied ever hitting her in the face at any time, including on the day she died.

The defendant's father testified that he spent pleasant times with the defendant, Hershell and Jarvina. He observed that the defendant was emotionally upset by the breakup with Hershell.

The defendant's mother testified that Hershell and her son treated each other well. She testified that on September 8, 1986, the defendant "picked up a catsup bottle and hit himself in the head and said he didn't want to live if he could not be with [Hershell]." She observed the defendant during the period he and Hershell were apart and described him as "very moody" and "real upset."

In rebuttal, Officer McCaster testified that when he first saw the defendant at the station the defendant said, "I'm the one you're looking for. I shot my old lady." Although the defendant told him that the gun went off accidentally, the defendant never said that the gun was in the victim's hand.

Officer Vucco testified that he advised the defendant of his *Miranda* rights and that the defendant seemed calm and spoke in a normal tone. The defendant told him that the gun was in his hand while he and Hershell were struggling and when it went off. Vucco said that there was no sofa in the front room of Hershell's apartment; he identified photographs of the crime scene; no sofa appeared in the photographs.

At the completion of the trial, the judge found the defendant not guilty of count I, which alleged that the defendant intended to

kill or do great bodily harm to Hershell or that he performed acts knowing that the acts would cause death to another. He found the defendant guilty of count II, which alleged that the defendant committed acts which created a strong probability of death or great bodily harm to another.

The defendant now acknowledges that the Illinois Supreme Court has explicitly rejected the argument he advanced initially, that is, that the State must exclude every reasonable hypothesis of innocence before a defendant may be found guilty. (*People v. Pintos* (1989), 133 Ill. 2d 286, 549 N.E.2d 344.) The defendant, however, continues to maintain that, even under the reasonable doubt standard of *Pintos*, the evidence was insufficient to support the conviction. In addition, he argues that the trial court's findings are logically inconsistent, if not also legally inconsistent, thus supporting his conclusion that the evidence did not prove him guilty beyond a reasonable doubt.

The defendant cites several cases to support the proposition that courts "have held evidence like the State's evidence here insufficient to support a conviction": *People v. Lewellen* (1969), 43 Ill. 2d 74, 250 N.E.2d 651; *People v. Garrett* (1975), 62 Ill. 2d 151, 339 N.E.2d 753; *People v. Calhoun* (1972), 4 Ill. App. 3d 683, 281 N.E.2d 363; *People v. LaGardo* (1978), 59 Ill. App. 3d 780, 376 N.E.2d 62. To begin, all those cases applied the reasonable-hypothesis-of-innocence standard which the defendant now concedes is not the proper standard. More important, however, all of the cases may be factually distinguished from this case. In *Lewellen* the defendant's self-defense theory was supported by bruises on the defendant and a psychiatrist's testimony regarding the defendant's paranoid delusion. In *Calhoun* the nature of the victim's wound and the condition of the bullet supported the defense theory that the bullet ricocheted. Moreover, the *Calhoun* court concluded that the State failed to prove the requisite mental state for murder, reasoning that "[d]efendant's explanation *** would, *if credible*, completely negate the evidence of intent or wilful conduct which the State sought to present." (Emphasis added.) (*Calhoun*, 4 Ill. App. 3d at 689-90.) In this case, the trial judge explicitly found the defendant's testimony incredible.

In *Garrett* the court reversed a murder conviction because a suicide note in the victim's handwriting was consistent with the defendant's testimony that the victim killed herself. In *LaGardo*, the defendant was charged with attempted murder. The victim testified under a grant of immunity. The appellate court concluded that

the trial court properly disregarded the victim's testimony as completely incredible but, in doing so, the trial court limited itself to only circumstantial evidence which, the appellate court said, failed to exclude the reasonable hypothesis that the defendant shot the victim, "a self-confessed felon with violent propensities," in self-defense. *LaGardo*, 59 Ill. App. 3d at 784.

██ ■ In this case, the trial judge found the defendant's version of the occurrence incredible. In our judgment the record amply supports that finding. The defendant's testimony was contradicted by Wilson and Officers Peterson, McCaster and Vucco. Peterson and McCaster both testified that the defendant had told them even before he was questioned, "I shot my old lady." The defendant denied making those statements. Vucco testified that the defendant said that the gun was in his hand when it went off. The defendant denied making that statement. Vucco also refuted the defendant's story that he and Hershell were sitting on a sofa just before the struggle began. Wilson established the virtual impossibility of the defendant's version of the sequence of events. Wilson said that between 1 and 2½ minutes elapsed from the time the defendant left him near the car and the shooting. It is inconceivable to us that the defendant could have left Wilson, kicked the door down, conversed with Hershell to the extent he described all in 2½ minutes.

When a defendant's "testimony allegedly constitutes the only evidence of what actually took place, the trier of fact is not obligated to accept all, or even any part, of his statements but may consider the reasonableness of the defense offered, assess its probabilities, if any, and reject that evidence which it finds contradictory, unlikely, or improbable in light of other facts before it." (*People v. Eliason* (1983), 117 Ill. App. 3d 683, 695-96, 453 N.E.2d 908, 915.) "The trier of fact may disregard exculpatory accounts or other evidence that tends to support or be consistent with defendant's innocence and rest its decision instead on the circumstantial evidence of guilt presented by the State." (*People v. Viano* (1985), 139 Ill. App. 3d 560, 566, 487 N.E.2d 623, 628.) The circumstantial evidence shows the following: There were two lacerations to Hershell's lower lip from which it could be inferred that the defendant had struck Hershell. At the time he went back to the apartment the defendant knew that Hershell was alone. He had pointedly asked her before whether she was alone. He was a jealous and angry individual armed with a gun, who kicked down a barricaded door and who, after the killing, in a display of consciousness of guilt, fled and hid the weapon. In our judgment, that circumstantial evidence supports

a finding of guilty of murder beyond a reasonable doubt. Our holding makes it unnecessary to discuss the many cases cited by the defendant to support his contention that the evidence, at best, established involuntary manslaughter.

■ The defendant also argues that the trial judge's findings are logically, if not legally, inconsistent and therefore require reversal. We do not agree. The precise argument advanced by the defendant was made and rejected in *People v. Stalions* (1986), 139 Ill. App. 3d 1033, 488 N.E.2d 297. Here, the trial judge found that the defendant committed knowing murder under section 9—1(a)(2) but not intentional murder under section 9—1(a)(1). (Ill. Rev. Stat. 1987, ch. 38, pars. 9—1(a)(1), (a)(2).) Those two sections require different mental states and thus the findings were not legally inconsistent. (See *People v. Murray* (1975), 34 Ill. App. 3d 521, 340 N.E.2d 186.) Nor are they logically inconsistent. The judge's findings do not require a conclusion that he both accepted and rejected the same theory of the case for the State or the same theory of the defense. The judge stated that he did not believe the defendant, thus rejecting the defense theory that the defendant was not holding the gun when it fired and accepting the State's theory that the defendant broke into Hershell's apartment with a gun, had his finger on the trigger and fired the gun.

The defendant next contends that he did not receive effective assistance of counsel. He alleges that his counsel ignored or overlooked the second count of the indictment, which alleged knowing performance of acts creating a strong probability of death or great bodily harm; that his counsel presented inconsistent defenses; and that he failed to present a "defense [*sic*]" of involuntary manslaughter.

■ The proper standard for attorney performance is that of reasonably effective assistance judged by an objective standard of reasonableness: reasonableness under prevailing professional norms. *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052; *People v. Albanese* (1984), 104 Ill. 2d 504, 473 N.E.2d 1246.

■ The defendant's counsel adequately framed the issue in the case as one of the defendant's state of mind, whether Hershell was killed accidentally or whether the defendant killed her under either provision of section 9—1(a). In his opening statement the defendant's attorney stated as follows:

"There is no issue [the defendant] was there. There is no issue that [Hershell] died. There is no issue that there is a

gun. He turned himself in. He showed the police where the gun was. *There is no intent.* This is not a situation where he went there to kill her. *This is an accidental homicide.*" (Emphasis added.)

He pursued this theory of defense during trial when he stated to the judge, "The whole issue in this case is state of mind, or whether it was an accident."

In his closing argument he continued to stress that the shooting was an accident and that the defendant was innocent of murder. He concluded his remarks as follows:

"I would suggest that the way the physical evidence came out is consistent with what the defendant testified to, and that this is an accidental homicide. At best it is a voluntary [*sic*], but it certainly isn't a murder."

In the post-trial motion the defense attorney said this:

"You heard all the evidence and you made your ruling; however, I think after much deliberation myself and going over the file and going over my notes that *I still suggest* to this Court that at best the State prove[d] the defendant Jarvis Brooks guilty of involuntary manslaughter." (Emphasis added.)

In our judgment the defense attorney did not overlook or ignore the second count of the indictment and he did not present inconsistent defenses. He pursued the competent trial strategy of seeking a complete acquittal on all charges based on the same defense of accident. Moreover, *if* the defense attorney is properly quoted as referring to voluntary manslaughter during the trial, we are convinced that he misspoke and that the trial judge was not misled. The trial judge, unlike a jury, was aware of the elements of voluntary and involuntary manslaughter. Voluntary manslaughter involves an intentional killing done under a sudden and intense passion resulting from serious provocation by the person killed or the intentional or knowing killing of another under an unreasonable belief that the use of force is justified. (Ill. Rev. Stat. 1985, ch. 38, par. 9—2.) Involuntary manslaughter involves an unintentional killing and reckless action. (Ill. Rev. Stat. 1985, ch. 38, par. 9—3.) The defense throughout was that the killing was unintentional. Clearly, therefore, the court had to know that when the defense attorney talked about manslaughter he was referring to involuntary manslaughter. Consequently, we reject the defendant's claim that he was not provided effective assistance of counsel.

▮ The defendant last contends that the sentence imposed was

excessive; he seeks a reduction of the sentence of 25 years' imprisonment to the minimum term of 20 years' imprisonment. He cites his age at the time of the offense (20 years old), his lack of any criminal history, his strong family background, his educational background, his history of regular employment, his active involvement in his church, his emotional distress caused by the breakup with the victim and his alcohol use.

Before passing sentence, the trial judge stated that he considered the factors in mitigation and aggravation under the sentencing statute. His sentencing determination may not be set aside absent an abuse of discretion. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) We cannot say that the 25-year sentence imposed by the judge constituted an abuse of discretion.

For all these reasons, the judgment of conviction of murder, including the sentence, is affirmed.

■■ The State concedes that the defendant's conviction for armed violence should be vacated because the murder served as the predicate felony for the armed violence count (*People v. Donaldson* (1982), 91 Ill. 2d 164, 435 N.E.2d 477.) The defendant's conviction of armed violence is vacated.

Judgment affirmed in part and vacated in part.

McNAMARA and RAKOWSKI, JJ., concur.