THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, *v.* SHARON L. McNAIR, Defendant-Appellee.

Fifth District   No. 81—495

Opinion filed March 8, 1983.

KARNS, J., dissenting.

William A. Schuwerk, Jr., State's Attorney, of Chester (Martin N. Ashley and Raymond F. Buckley, Jr., both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Steven Clark and Scott Graham, both of State Appellate Defender's Office, of Chicago, and Sheva Rifkind, law student, for appellee.

JUSTICE JONES delivered the opinion of the court:

The State appeals an order of the trial court granting the motion of defendant, Sharon McNair, to quash her arrest and to suppress evidence. The defendant was charged with the unlawful possession of cannabis and with bringing contraband into a penal institution. Fol-

lowing a hearing the trial court found that police lacked probable cause to arrest the defendant and quashed the arrest. Because the arrest was ruled illegal, the trial court ordered all evidence obtained following the arrest suppressed. The State raises five issues: (1) whether the police officers' summoning the defendant to the door of her motel room constituted an arrest; (2) whether there was probable cause to arrest the defendant prior to her identification at the door of her motel room; (3) whether there was an independent basis for the in-court identification of the defendant; (4) whether the court erred in quashing the warrant to search the defendant's cars; (5) whether the court erred in suppressing evidence seized from the defendant's motel room.

At the hearing on the motion to quash and to suppress, the State called four witnesses, the four police officers who had gone to the door of defendant's motel room. Defendant presented no evidence.

The first witness to testify at the hearing was Lieutenant Tinsman, employed by the Menard Correctional Center and assigned on the night the incident occurred to watch a certain area of that facility. The witness had been told that an "object" was to be thrown over the fence located there. Watching with binoculars from a second-floor balcony at about 10:08 p.m. on July 1, 1981, he saw an automobile come into the Center along the fence in "close proximity" to the area he had been assigned to watch. Having parked the car, a woman leaned briefly out of the window on the passenger side of the automobile and waved in the direction of the South Cell House. Three to four minutes later, during which time the witness observed movement within the vehicle, she leaned "from about the waist up" out of the same window and threw an object that landed "approximately eighteen feet from the fireplug where I was told the individual would drop the package." The package landed in an area accessible to inmates. The witness testified that he was about 180 feet from the car as he watched and that he had described the woman, the only person he saw in the car, as being in her early thirties, "a female, white, petite in form, had long dark hair, large rounded type prescription glasses, not the sun type." He said she was wearing "a paisley type dark print blouse." On cross-examination he denied that the person he had seen could have been a "light-skinned Negroid female." He stated that the area was well lit by a double mercury vapor light and that he had been able to view the woman for a total of about 45 to 60 seconds. He had been unable, however, to obtain a license plate number or to determine the precise make and model of the car, which he described as late-model and dark. The lights of the car had been turned

off after it had been backed between two cars parked in the parking lot and were not turned on again until after the vehicle had begun to leave the parking lot. The witness stated that he could not see the license number because "with the binoculars, when the lights came on it blurred the plate number." He stated further that the vehicles between which the car had been parked had obscured his view of the lower part of the vehicle.

The contents of the package that had been thrown over the fence were tested shortly thereafter and proved to be cannabis. The witness said that he had described the car and its driver to Captain Umbdenstock, another security officer at the correctional facility, who "notified District about Sharon McNair, a description of her car and so forth." He stated that the Captain had asked that a blue Cadillac be sought and that the Captain had given a license number for that vehicle. Later the witness learned that officers of the Chester Police Department had located a car of that description bearing the license number in question in the parking lot of a local motel. At about 12:10 a.m. on July 12, 1981, approximately two hours after the package was thrown over the fence, the witness went with Captain Umbdenstock to the parking lot of the motel and met Officers Clasen and Hogrefe of the Chester Police Department. In the parking lot the witness saw a Cadillac as well as the car he though he had observed at Menard, an Oldsmobile. Having ascertained which room at the motel was defendant's, they went to it. The testimony of the witness continued as follows:

"I think Officer Hogrefe knocked on the door. Clasen presented himself as Chester Police Department, requesting the occupants come to the door; they wished to talk to them.

[State's Attorney]: Then what happened?

[Lieutenant Tinsman]: At first the person that answered from inside said she was not dressed and there was a delay. Officer Clasen knocked again. The door opened shortly after that. Officer Hogrefe, I think it was Officer Hogrefe, called me forward and asked if I could identify any of the persons that was [sic] in the room. It was at that time that I identified a person that turned out to be Sharon McNair."

The witness testified that defendant had opened the door and was standing about a foot and a half or two feet from the door when he identified her.

On cross-examination the following colloquy took place between the witness and defendant's attorney:

"Q But you remember him knocking on the door the second

time after it was not opened the first time?

A He knocked on the door the second time after the door was not opened and what I guess he considered the appropriate time length.

Q And he at that point indicated something as he knocked on the door. Is that correct?

A He reannounced himself.

Q And directed the people to open the door. Is that correct?

A That's correct.

Q So they opened the door pursuant to his direction?

A Yes."

The witness said that when the door of the motel room was opened, two women, one black and the other white, were inside.

The next witness was Captain Umbdenstock, who testified that he had been called to the correctional facility between 10 and 11 p.m. on July 1, 1981, because of the package that had been thrown over the fence. He stated that he had put out a call for the police to watch for a 1978 Cadillac owned by Sharon McNair with a license number of EQ3892. The witness had seen defendant at the institution prior to this time. Asked why he had put out a "pick-up" on that particular car, the witness answered that he had "had reason to believe that that person was to drop a package of what I thought to be cannabis, possibly that evening." He said he had had information that "there might possibly be a drop over the fence by the fireplug" and that "based on the fact that she had been at the institution that day and had another person in the car with her, I told [security personnel at Menard] there might possibly be a black female or a white female, I didn't know, but I had reason to believe that there would be a drop."

Upon arriving at Menard, the witness received Lieutenant Tinsman's description of the person who had thrown the package. Asked whether he had had "any idea who this individual might be," with the description he had received, he answered that he "couldn't say it was Sharon McNair." When they arrived at the motel parking lot they saw the Cadillac in question parked next to the Oldsmobile. He described the events that took place at the door of the motel room as follows:

"City Police knocked on the door and identified thereselves [sic]; said they wanted to talk to her, for her to come to the door. And I kind of stood back from the door there a couple feet. I didn't get in anybody's way or anything. And then after two, maybe three minutes she come [sic] to the door, opened the door and City Police Officer, Tinsman stepped up behind

him and he stepped to the side and said is this the lady and Tinsman says that's her."

Asked on cross-examination whether a remark had been made to the effect that "they would break the door down or kick it in if the door wasn't open [sic]," the witness answered, "I can honestly say I didn't hear it said, but I can't say that it was or wasn't [made]."

The third witness called by the State was Officer Clasen of the Chester Police Department. He indicated that investigation undertaken after finding the Cadillac in the parking lot of the motel showed it belonged to Sharon McNair. He stated that he and the other three officers had gone to the door of defendant's motel room and described what had happened at the door as follows:

"Officer Hogrefe knocked on the door and I yelled out it's Chester Police and we would like to talk to the subject for a minute.

[State's Attorney]: What happened then?

[Officer Clasen]: She said she had to get some clothes on and I waited about twenty seconds, approximately, and knocked again and said we wanted to talk to her, we had to talk to her for a minute. I said we might have to knock the door down. That was just a statement.

Q: Okay. Then what happened.

A: She came to the door and opened the door.

Q: You say she. Who is she?

A: Sharon McNair."

He testified that when the defendant opened the door "we turned around and asked Lieutenant Tinsman if this was the lady that he was talking about and he said yes, positive ID." He said that they then arrested defendant. On cross-examination the following exchange took place between the witness and defendant's attorney:

"Q: And after the door didn't open you knocked on it again?

A: Yes, sir.

Q: At that time you directed her to open the door?

A: I asked her to open the door.

Q: You indicated you might have to knock it down if she wouldn't open it.

A: Yes, sir."

The fourth and final witness to be called was Officer Hogrefe, a patrolman for the city of Chester. He testified that after he and the other three officers had gone to the door of defendant's motel room, the following events took place:

"[W]e *** knocked on the door, told the subject we were the Chester Police and we were investigating a complaint we had

signed on her. She stated wait until I get dressed. A few minutes later she opened the door. Upon opening the door, both Officer Clasen and myself entered and asked Mr. Tinsman to step forward and identify the subject. He did so, identifying Sharon McNair as the subject who threw some cannabis over the fence as [*sic*] Menard."

He stated that after defendant was arrested the officers searched the immediate area around her, finding nine or 10 grams of cannabis in her purse, which was open on the floor at the end of the dresser near the door. The cannabis was visible, he said, from a standing position. In a box, the top of which was open, they found scales. The box was next to the wall close to the door. Several rolls of tape were on the dresser. Both the Cadillac, which belonged to defendant, and the Oldsmobile, which she had rented, were impounded and subsequently searched pursuant to a search warrant.

In making his ruling the trial court said,

"Well, this is a very close case, I think. I think it does hinge on what happened outside the door of the motel room. It also hinges somewhat on the effect Captain Umbdenstock stated that he could not say it was Sharon McNair who was described to him so that there was really some doubt as to who they were really looking for in the first place."

The trial court determined that everything should be suppressed, including both the out-of-court and in-court identifications of defendant, as well as the evidence taken from the motel room and the two automobiles. The court stated further:

"The ID is, I think, that's the crucial part of this whole case. I think when the officer said that he was going to maybe knock the door down, I think that was sufficient for her to open the door and I think that's a crucial part of the case or he might have to knock it down; whatever was said. There seems to be a little variance as to what was actually said."

We consider first the issue the State raises with respect to probable cause, that there was probable cause to arrest the defendant prior to her identification by Lieutenant Tinsman at the door of her motel room. As was said in *People v. Creach* (1980), 79 Ill. 2d 96, 402 N.E.2d 228, *cert. denied* (1980), 449 U.S. 1010, 66 L. Ed. 2d 467, 101 S. Ct. 564, probable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient to warrant a man of reasonable caution in the belief that an offense has been committed and that the person arrested has committed the offense. Existence of probable cause depends upon the totality of the

circumstances as viewed under practical considerations of everyday life from the point of view of reasonable men. *People v. Green* (1980), 88 Ill. App. 3d 929, 410 N.E.2d 1003.

In the case at bar, security officers at the correctional facility had received information that possibly on the date in question the defendant, who was known to security personnel and, therefore, known to be white, would drop a package apparently containing cannabis over the fence of the facility near a certain fireplug. Because the defendant had been seen at the institution that day accompanied by a black woman, security personnel thought the black woman might make such a drop instead of defendant. On the evening in question a white woman, who appeared to be alone, was observed throwing a package, which later proved to contain cannabis, over the fence so that it landed about 18 feet from the fireplug in question. Although Captain Umbdenstock apparently could not say with certainty from the description given by Lieutenant Tinsman that the woman who had thrown the package was, in fact, Sharon McNair, he appears to have thought she might well be, in view of the subsequent search undertaken at his request for defendant's automobile, which was found in the parking lot of a local motel and determined to belong to her. The subsequent viewing of defendant by Lieutenant Tinsman in order to identify her lends credence to the idea that the officers believed defendant might well be the person who had thrown the package over the fence. We think that such knowledge would be sufficient to warrant a man of reasonable caution in the belief that an offense had been committed and that the defendant had committed it. Given the totality of the circumstances as viewed under the practical considerations of everyday life from the point of view of reasonable men, probable cause existed to arrest defendant when the officers went to the door of her motel room although they apparently intended to arrest her only if Lieutenant Tinsman's identification of her was positive.

In *People v. Bean* (1981), 84 Ill. 2d 64, 69, 417 N.E.2d 608, 611, *cert. denied* (1981), 454 U.S. 821, 70 L. Ed. 2d 93, 102 S. Ct. 106, the supreme court discussed entry by police into a residence to make an arrest based upon probable cause:

"We agree that generally an arrest warrant is the desired means by which an individual's right to privacy is protected. (*Payton v. New York* (1980), 445 U.S. 573, 590, 63 L. Ed. 2d 639, 653, 100 S. Ct. 1371, 1381-82; *McDonald v. United States* (1948), 335 U.S. 451, 453, 93 L. Ed. 153, 157, 69 S. Ct. 191, 192.) However, when voluntary consent is given to enter one's

residence and an arrest is effected based on probable cause, the suspect's rights under the fourth amendment are not violated, even in the absence of exigent circumstances. That standard for valid consent applied by the Supreme Court in a variety of circumstances is whether that consent is voluntarily given. (*Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 248-49, 36 L. Ed. 2d 854, 875, 93 S. Ct. 2041, 2058-59; *Bumper v. North Carolina* (1968), 391 U.S. 543, 548, 20 L. Ed. 2d 797, 802, 88 S. Ct. 1788, 1791. See *Johnson v. United States* (1948), 333 U.S. 10, 13, 92 L. Ed. 436, 440, 68 S. Ct. 367, 368-69.)"

Defendant contends that her consent was not voluntarily given, that she did not consent to the entry by opening the door but, rather, merely acquiesced to the inevitable entry by police into the room.

In a motion to suppress evidence unlawfully seized, the burden of proving that the search and seizure were unlawful is on the defendant. (Ill. Rev. Stat. 1981, ch. 38, par. 114—12(b).) At the hearing on the motion to suppress, defendant put on no evidence at all. However, in *Bumper v. North Carolina* (1968), 391 U.S. 543, 20 L. Ed. 2d 797, 88 S. Ct. 1788, the Supreme Court stated that a prosecutor, when he seeks to rely upon consent to justify the lawfulness of a search, has the burden of proving that the consent was, in fact, freely and voluntarily given. The question whether a consent to a search was, in fact, voluntary rather than the product of duress or coercion, either express or implied, is a question of fact to be determined from the totality of all the circumstances. *Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 36 L. Ed. 2d 854, 93 S. Ct. 2041.

On review, a ruling of the circuit court on a defendant's motion to suppress should not be set aside unless it is found to be "clearly" erroneous. (*People v. Clark* (1982), 92 Ill. 2d 96, 440 N.E.2d 869.) In the instant case, Officer Clasen testified to having said "[w]e might have to knock the door down." Whether the remark was directed to the defendant is not made clear in the record. The remark could have been directed to one or more of the other three officers standing at the door with him and is, for that reason, ambiguous. There is no evidence in the record that the remark was heard by any of the other officers present or either of the two occupants of the motel room, including the defendant. One of the officers present testified that he had not heard such a remark, though he could not say it had not, in fact, been made, and the other two officers did not testify at all regarding the remark during either direct or cross-examination. The black woman in the room at the time defendant opened the door did not testify at all. It is not known whether the remark was even

audible to this person or to the defendant. There is no evidence that the police addressed the occupants of the room unduly loudly. There is no evidence of violent conduct of any kind, such as a pounding on the door. There is no evidence that the defendant knew that more than two officers were at the door, so that she might have felt intimidated by the presence of several officers outside her door. Although the hour was late, there is no evidence that defendant was sleeping or that she had already retired for the night.

According to the testimony, Officer Hogrefe seems to have knocked on the door, and Officer Clasen appears to have identified himself as a policeman and asked the occupants of the room to come to the door, saying the police wished to talk to them. Defendant said she had to dress. Police waited and knocked again, indicating again that they wanted to talk to her. Officer Clasen thereupon made the remark in question, and defendant came to the door. Under the totality of all the circumstances presented here, we think that the defendant opened the door, not under duress or coercion, but voluntarily. Since defendant's consent was voluntary and police had probable cause to arrest her at the time she opened the door, the arrest was lawful. For that reason, evidence of Lieutenant Tinsman's subsequent identification of her, both in and out of court, ought not to have been suppressed. For the same reason the evidence in plain view observed in the motel room and seized by the police ought not to have been suppressed. Nor should the evidence taken from the two automobiles pursuant to a search warrant have been suppressed in view of the lawfulness of the arrest.

Reversed.

KASSERMAN, J., concurs.

JUSTICE KARNS, dissenting:
The problem here, as I see it, is that no one had ever identified defendant, prior to the time she was forced to come to the door of the motel room, as the person who threw the package over the fence. When Lieutenant Tinsman related to Captain Umbdenstock what he had seen, and it was Umbdenstock who had received the tip and directed Tinsman to view the area in question, he could not relate the description given to defendant, nor the car described by Tinsman, to defendant. The local police were notified to be on the lookout not for an Oldsmobile but a blue Cadillac, which was obviously not the car that Tinsman had seen, as Tinsman confirmed in his testimony.

18

Umbdenstock testified that after talking to Tinsman he could not say that the driver was defendant, whom he knew and could describe. I do not believe that the police had probable cause to arrest defendant at the time they arrived at her motel room. The information known to Umbdenstock and Tinsman and related to the local police was obviously based on a tip from an anonymous informant whose reliability was never established. (*Aguilar v. Texas* (1964), 378 U.S. 108, 12 L. Ed. 2d 723, 84 S. Ct. 1509.) The only corroboration here was of the kind rejected in *People v. Greer* (1981), 87 Ill. 2d 89, 429 N.E.2d 505, and *People v. Gates* (1981), 85 Ill. 2d 376, 423 N.E.2d 887, as "self verifying."

Additionally, I consider the warrantless viewing of defendant at her motel room to be equivalent to a warrantless entry to effectuate her arrest. She did not just voluntarily come to the door to be viewed by Lieutenant Tinsman. The police stated that the door would be "knocked down" if she didn't come to the door. What was done here was the equivalent of a warrantless entry into her room, absent exigent circumstances, of a kind condemned in *Payton v. New York* (1980), 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371.

As to consent, the able trial judge found defendant did not consent. His determination of this fact question, as well as others, is not to be ignored unless clearly erroneous. (*People v. Clark* (1982), 92 Ill. 2d 96, 440 N.E.2d 869.) Here the majority has apparently found the resolution of factual disputes, and matters of credibility, by the trial court, to be "clearly erroneous"; however, it seems obvious that the trial court found that the statement that the door would be "knocked down" was directed to the occupants of the room. I do not believe that the testimony is ambiguous.

The trial court gave thoughtful consideration to a resolution of the factual questions here. His decision should be affirmed.