THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
MANUEL YERO TORRES, Defendant-Appellant.

First District (5th Division)   No. 83—0570

Opinion filed February 1, 1985.

James J. Doherty, Public Defender, of Chicago (Milton S. Travis, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Timothy J. Joyce, and Patrick J. Foley, Assistant State's Attorneys, of counsel), for the People.

JUSTICE LORENZ delivered the opinion of the court:

Following a jury trial, defendant Manuel Yero Torres was convicted of murder (Ill. Rev. Stat. 1981, ch. 38, par. 9—1) and sentenced to 28 years' imprisonment. He appeals and contends that he was prejudiced by the erroneous introduction of hearsay motive testimony, and that he was denied the opportunity to present evidence of the victim's gang affiliation. The following facts pertain to our decision.

At about 6:30 p.m. on May 21, 1981, David Caceres went to the 2600 block north on Spaulding Avenue, along with Edgar Vega, Antonio Rios, and Danny. Edgar Vega testified that Caceres had planned to tatoo him, and in order to borrow the necessary inks and needles, they went to see defendant. Defendant was in front of his apartment building when the group arrived, and while defendant and Caceres entered the building, Vega waited outside. Fifteen minutes later, Vega heard "somebody get smacked." He turned and saw defendant strike Caceres two or three times. Caceres moved toward Vega, who extended his cane toward Caceres; but Vega saw defendant pull a revolver from the back of his pants, so he withdrew the cane and gestured toward defendant. Caceres then saw the gun, and ran away. Defendant shot two or three times; Caceres fell to the ground 50 feet past Vega. Vega testified that defendant approached Caceres, who was face down on the ground, and fired two or three more bullets into him.

On cross-examination, Vega admitted that he had said at preliminary hearing that defendant fired "at least nine times," but he explained that defendant "clicked" the gun several times after the bullets ran out. Defense counsel asked whether he had told the police at the scene that he gave the cane to Caceres, that Caceres turned upon defendant, and that it was only then defendant pulled the gun. Vega responded that he wasn't sure, but he could see how the police could get that impression in the confusion. Vega said he tried to chase defendant, but defendant ran too fast. Vega admitted that he had belonged to the Orchestral Albany (OA) street gang when he was in eighth grade, but he stated that he was not a member at the time of the shooting.

Antonio Rios substantially corroborated Vega's testimony. He saw defendant strike Caceres two or three times, saw Caceres fall back toward Vega, and saw Vega reach toward Caceres with his cane. Next, he heard shots, but at this time, saw no gun. Caceres ran in Rios' direction and defendant chased him, shooting the gun, which Rios then saw. Rios stated that Caceres fell on his stomach 10 feet short of where he, Rios, was standing, and that defendant walked up to Caceres, pointed the gun at his lower spine, and fired three shots. Rios stayed with Caceres while Vega chased defendant.

Rios testified that he asked Caceres "what this was all about." Defendant objected to hearsay. Away from the jury, the State argued that Caceres' hearsay statement should be admitted as a spontaneous utterance, as a dying declaration, or as part of the *res gestae*. Defendant argued that a response to a question is not spontaneous, and that defendant was entitled to a hearing if the State wanted to introduce a dying declaration. The trial court denied all defense objections.

Before the jury, Rios testified that Caceres "told me that he had owed him $30 and he got shot over that," and that the $30 was "[f]or dealing reefer." Rios said that he had seen defendant about twice weekly prior to the shooting, when defendant was selling marijuana on Spaulding. Rios recalled that he was walking his bicycle that evening, and Danny was on roller skates.

On cross-examination, Rios said that at the time of the incident, he and Vega were about 16 years old, and Danny was about 14. He denied that he had told the police that defendant fired only after Caceres menaced defendant with the cane. Rios admitted that he and Vega had been members of the Orchestral Albany street gang, but said that that was a long time ago. On redirect, Rios said that Caceres had not been a member of the OA's, that OA members were primarily of Puerto Rican descent, and that he knew Caceres to be Cuban.

Ernesto Garcia testified that he heard shots and saw defendant stand over Caceres and shoot him. Garcia had been at defendant's apartment several days before the incident, and defendant had told him that he was going to shoot Caceres over $5. Several minutes after the shooting, defendant told Garcia that he shot Caceres because "he felt like it." Garcia stated that he was serving a prison sentence for aggravated battery and armed violence. He knew the victim and the defendant, and he knew that both were Cuban.

The Cook County medical examiner testified that the victim had five bullet wounds: four in the back, another near the left knee. The victim died at 4:40 a.m. on May 22, 1981, and the medical examiner

opined that the bullet wounds caused death. He indicated that the wounds were consistent with the victim's running away from defendant and with the victim lying on his stomach when he was shot. The victim was 5 feet 5½ inches, 164 pounds.

During his case, defendant called Chicago police officer Clifford Wood. Wood stated that he was one of the first officers on the scene, and that he prepared the police report. He recalled that someone had said that defendant pulled the gun when he saw Caceres coming at him with a cane, but he could not recall whether Vega, Rios, or someone else had made the statement. He said that comments were offered by many citizens whose names did not appear in the police report, and that the report's narrative was a composite of his understanding of what was said.

Defendant testified that he was born and raised in Cuba, and that he came to the United States in 1980. He met Caceres, also Cuban, in November of 1980. Defendant said that in April of 1981, about a month before the shooting, he and Caceres had a conversation at the corner of Diversey and Kedzie. The State objected to hearsay, and the court sustained the objection. Asked what Caceres *did* after the conversation was over, defendant testified that Caceres struck him and threatened to kill him. The State renewed its objection, and the trial court held a hearing away from the jury.

Defense counsel indicated that defendant would testify to Caceres' statements concerning gang affiliation, robberies and other violence. Defense counsel argued that the testimony was not hearsay because it was offered to establish the defendant's state of mind relative to self-defense and was not offered for the proof of the matter asserted. The trial court stated, "[I]t is clear to me as it is to anybody with any experience that [the statements] are only being offered by the defense to dirty up a dead man," and ruled that defendant could testify to Caceres' actions and threats, but that defendant would not be permitted to recount Caceres' statements of gang affiliation or other crimes.

Examination resumed, and defendant testified that Caceres had told him that he was having problems with the gang. Defendant advised Caceres to stay away from gangs. He said that the two of them had left Cuba to change their lives, and he questioned why Caceres should become involved with gangs and their problems. Defendant then repeated his testimony that Caceres struck him and threatened to kill him. Also in April, Caceres came to defendant's apartment and asked him to store a gun and two boxes of ammunition.

Defendant testified that on May 21, 1981, he was in his apartment when Caceres called to him from the street, asking for the gun.

Defendant brought the gun downstairs, but not the ammunition, and he said that he did not know whether the gun was loaded. Caceres said, "Remember that I said I was going to kill you," then slapped defendant. Caceres walked over to Vega and took the cane, brandished it menacingly and approached defendant. Defendant pulled out the gun, pointed down, turned his face, closed his eyes and fired. Defendant said that he was afraid of Caceres and the others with him, and hoped the gun or a shot would scare them away. He then walked away from the scene and disposed of the gun.

From photographs of graffiti on the 2600 block of Spaulding, defendant identified gang insignia which Caceres had told him were OA gang markings. Defendant loaned Caceres neither $30 nor $5; he had no ink and no needles. Defendant stated that Ernesto Garcia had never been in his apartment, and that Garcia was at the lake with a mutual friend on the day of the incident. Defendant explained that he did not come forward after the shooting because he was afraid of the police, Vega, Rios and Caceres' group.

On cross-examination, the assistant State's Attorney asked defendant whether he had given Caceres "six nickel bags of marijuana" valued at $30. Defendant objected, but the trial court overruled the objection, stating that it was better to have defendant's answer before the jury. Defendant denied any and all involvement with marijuana.

In closing argument, the assistant State's Attorney said that there was evidence that defendant supported himself by selling marijuana on Spaulding. Defense counsel stressed the gang-related nature of the crime, arguing that "David Caceres was more content to be a gang member, the kind of person who goes out and does the type of things you read about in the papers every day." Fourteen times, at least, defense counsel referred to Vega or Rios as gang members, and he suggested that Vega and Rios concocted a story to avenge their fellow gang member, Caceres.

The jury found defendant guilty of murder, and the trial court sentenced him to 28 years in prison. Defendant filed a timely notice of appeal.

OPINION

■ Defendant first contends that the trial court erred in permitting Rios to relate Caceres' statements immediately following the shooting. He maintains that the victim's statements were not spontaneous because they were made in response to questioning. Defendant further complains that numerous drug references by the prosecutor,

including the "six nickel bag" question, were improper, and that the prejudice engendered by these references outweighed the probative value of the evidence.

Illinois recognizes an exception to the hearsay rule for spontaneous declarations where three factors are present: (1) an event sufficiently startling to produce an unreflecting statement; (2) a statement which relates to the circumstances of the event; and (3) absence of time to fabricate. (*People v. Poland* (1961), 22 Ill. 2d 175, 181, 174 N.E.2d 804.) Such exclamations are considered reliable in theory because the shocking occurrence paralyzes the ability to fabricate, producing a statement which expresses the true belief of the declarant. (*People v. Damen* (1963), 28 Ill. 2d 464, 471, 193 N.E.2d 25.) Consistent with this rationale, one could argue that posing a question to the declarant necessarily engages the declarant's reflective faculty and destroys spontaneity, but our supreme court has rejected this analysis. In *People v. Damen* (1963), 28 Ill. 2d 464, 193 N.E.2d 25, the court held that a victim's statements to a police officer were properly admitted as spontaneous declarations, even though the statements were made in response to the officer's question, "What happened?" The court stated that the question was insufficient to destroy the spontaneity of the statement. (28 Ill. 2d 464, 472, 193 N.E.2d 25.) More recently, this court held that asking the declarant "Who did this to you?" did not destroy the spontaneity of the response. (*People v. Sanchez* (1982), 105 Ill. App. 3d 488, 491-92, 434 N.E.2d 395.) We conclude that the issue is not simply whether the declarant reflected; rather, it is whether the statement was produced by the shock of the event or by the self-interested reflective faculty of the declarant.

Applied to the facts at hand, we find that Caceres' statements were properly admitted as spontaneous declarations despite Rios' question. Certainly, being shot five times qualifies as a startling event. The statements concerned the shooting and were made almost immediately afterwards. It is true that reasoning is involved in responding to a question, but the same is true of all meaningful speech. We believe that the statements at issue were dominated by the shooting and not by Caceres' self-interest.

■ With respect to the other drug references, we believe that defendant's complaints are meritless. Defendant failed to object contemporaneously to comments during opening and closing arguments, and failed to specify such comments as error in his post-trial motion. Similarly, Rios' testimony, that he had seen defendant dealing marijuana on Spaulding, was unchallenged at or after trial. Therefore, we consider any error in such comment and testimony to have been

waived. See *People v. Carlson* (1980), 79 Ill. 2d 564, 576-78, 404 N.E.2d 233, and authority cited therein.

■ Further, if we reached the merits, we would approve the testimony and comment at issue. Caceres' statements tended to show defendant's motive for the crime, thus Rios' testimony was a relevant explanation of motive. Contrary to defendant's assertion, the prosecutor's cross-examination concerning "six nickel bags of marijuana" was not baseless; rather it was based on Caceres' statement that he owed defendant $30 for marijuana, Rios' testimony that defendant dealt marijuana, and Garcia's testimony that defendant intended to shoot Caceres over $5. It is well settled that a defendant who testifies on his own behalf subjects himself to legitimate and pertinent cross-examination, the scope of which rests in the sound discretion of the trial court. (*People v. Provo* (1951), 409 Ill. 63, 68-69, 97 N.E.2d 802.) Since the question had some basis in evidence, the trial court did not abuse its discretion by permitting defendant to respond. All of these matters being properly in evidence, the assistant State's Attorney was entitled to comment. See *People v. Warmack* (1980), 83 Ill. 2d 112, 125-26, 413 N.E.2d 1254.

Finally, with respect to drug references, we reject defendant's argument that prejudice outweighed probity. Defendant relies upon *People v. Battle* (1962), 24 Ill. 2d 592, 182 N.E.2d 713. In that case, the State's theory of motive was that the victim had informed the police of the defendant's narcotic sales, and the defendant sought revenge. Our supreme court disapproved testimony of narcotics sales because the State adduced no evidence that the defendant knew that the victim had informed the police: the evidence failed to establish a logical connection between drugs and the shooting. (24 Ill. 2d 592, 596-97.) By contrast, the testimony in this case fully sustains that connection. Rios testified that Caceres said he was shot over $30 for dealing marijuana. The testimony was highly probative on the issue of motive, and no unfair prejudice resulted.

■ Defendant next contends that the trial court erred in excluding testimony to Caceres' involvement in gang-related shootings and robberies. The State argues in the alternative that defendant's offer of proof was inadequate, that the testimony was properly excluded, or that the exclusion, if error, was harmless. We believe that defendant's offer of proof was sufficient, and that the trial court's ruling was error.

The State first maintains that defendant's offer of proof was inadequate in that it did not show "how those alleged facts affected defendant's state of mind," and did not provide a basis for the trial

court to conclude "that these allegations of the victim's prior activities could be substantiated." We are aware of no rule which requires that an offer of proof contain references to corroborative evidence, and the State suggests no reason that the law should be so. "[H]ow those alleged facts affected defendant's state of mind" is obvious: the victim's statements to defendant concerning gang-related shootings and robberies could be found by the jury to have contributed to defendant's fear of the victim, his perception of danger at the time, and his motive. See *People v. Stombaugh* (1972), 52 Ill. 2d 130, 139, 284 N.E.2d 640.

At trial, the State's objection went to the hearsay nature of the evidence. Defense counsel stated that defendant would testify to Caceres' statements that he had participated in gang-related robberies and shootings, and counsel argued that the statements were not hearsay because they were offered to show defendant's state of mind at the time of the shooting and not to show that Caceres participated in other crimes. In our view, this offer of proof sufficiently apprised the trial court of the nature of the evidence and the proposed basis for admission.

Moreover, we believe that the trial court erred in excluding defendant's testimony as set forth in the offer of proof. The court ruled that defendant could testify to his personal observations of Caceres and to any threats, but that he could not repeat statements of gang affiliation or other crimes. The court stated that such evidence was irrelevant and untestable, and was offered only to "dirty up a dead man."

The State concedes that threats and acts of violence by the victim are admissible to show the defendant's state of mind, but argues that defense counsel sought to elicit the victim's reputation for violence, and that such testimony is inadmissible. The State's reading of the record is strained. The offer of proof extended beyond reputation and focused upon the victim's statements as they affected defendant's state of mind. The trial court's ruling broadly forbade testimony to gang affiliation and other crimes.

In *People v. Gonzalez* (1984), 104 Ill. 2d 332, the trial court prohibited all references to gang affiliation. There, the defendant maintained that one of the State's witnesses had framed him in order to "get even" for the defendant's having quit the gang. Our supreme court held that the defendant was unfairly limited in presenting his theory of defense, and noted:

"Illinois courts have often held questions regarding gang affiliation proper when the State has sought to introduce evidence

of the defendant's gang activities, in spite of the risk of prejudice to the defendant. [Citations.] Simple justice requires a symmetrical rule that allows a defendant to ask such questions on cross-examination to show bias in a State's witness." (104 Ill. 2d 332, 338.)

Although gang affiliation went to a different issue in *Gonzalez*, we believe that the principle enunciated is applicable here.

The trial court's ruling in this case unnecessarily restricted defendant in the full presentation of his theory of self-defense. The testimony offered was both relevant and capable of being tested: relevant to defendant's state of mind, and capable of being tested by cross-examination. The absence of corroboration diminished the weight of the evidence, but did not affect its admissibility. If the trial judge felt that the testimony would "dirty up a dead man," he could admonish the jury that the evidence was not offered for its truth. While protection of the victim's reputation is laudable, protection of defendant's right to place relevant evidence before the jury is essential.

■ Finally, the State argues that the error was harmless, and we agree. The Illinois Supreme Court has outlined three approaches to measuring error: (1) focusing on the error to determine whether it contributed to the conviction; (2) examining other evidence to see if it overwhelmingly established guilt; and (3) deciding whether the evidence was merely cumulative or duplicative. (*People v. Wilkerson* (1981), 87 Ill. 2d 151, 157, 429 N.E.2d 526.) We believe that the testimony actually excluded was largely cumulative, that such testimony would contribute little to the jury's resolution of the facts, and that the evidence overwhelmingly established defendant's state of mind.

The record reveals that defendant testified to Caceres' gang affiliation more than once, despite the trial court's ruling. He testified that Caceres said he was having problems in the OA's, that Caceres explained the OA gang graffiti, and that defendant feared Caceres' "group." Defendant testified further that one month before the shooting, Caceres struck him and threatened to kill him, and that immediately before the shooting, Caceres struck him, renewed the threat, then menaced him with a cane. In addition, defendant testified that Caceres had asked him to hold a gun and ammunition.

Defense counsel cross-examined prosecution witnesses regarding gang affiliation. In closing argument, defense counsel argued not only that Vega and Rios were involved in a gang, but also that Caceres was a member. Counsel stressed the gang theme as it related to defendant's state of mind during the incident, and argued that prose-

cution witnesses were lying because they belonged to the same gang as Caceres.

Given this extensive testimony and argument as to the reasons for his fear, defendant's additional testimony to Caceres' purported statements concerning other robberies and shootings would have been cumulative. More compelling is our belief that the jury resolved the state-of-mind issue on the occurrence testimony.

The eyewitnesses testified that defendant struck the victim two or three times, then pulled a gun as the victim reached for a cane. The victim ran, defendant fired two or three times, and the victim fell face first to the ground. Defendant walked up to the victim and fired two or three bullets into his back. The medical examiner corroborated this testimony, stating that the victim died from bullet wounds, four of which entered the back, and none of which entered frontally.

Defendant's occurrence testimony, on the other hand, is implausible. Defendant stated that one month after threatening him, Caceres asked for his gun back. Defendant, not knowing if the gun was loaded, put it in the back of his pants and went downstairs. Then, without asking for the gun, Caceres slapped and threatened to kill defendant. And although Caceres had the better of the fight to this point, he disengaged and took Vega's cane. As Caceres approached menacingly, defendant pulled out the gun (loaded or unloaded), pointed down, turned his face, closed his eyes, and fired.

We believe that the occurrence testimony established defendant's intent beyond any doubt, regardless of the historical development of defendant's *mentum*. We further believe that the jury must have resolved the issue on this basis. Accordingly, we find that the exclusion of defendant's further testimony constituted harmless error.

For the foregoing reasons, we affirm the judgment of the circuit court.

Affirmed.

MEJDA, P.J., and SULLIVAN, J., concur.