THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. HOWARD GROSS, Defendant-Appellant.

First District (1st Division)   No. 85—2292

Opinion filed February 8, 1988.

MANNING, J., dissenting.

Michael D. Ettinger and Barry S. Pechter, both of Oak Lawn, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Sharon Gaull, Assistant

State's Attorney, and Elizabeth Sklarsky, Special Assistant State's Attorney, of counsel), for the People.

JUSTICE O'CONNOR delivered the opinion of the court:

Following a bench trial, defendant Howard Gross was convicted of the murder of Gregory Horn and sentenced to 20 years in the Illinois Department of Corrections. On appeal, he raises the following issues: (1) whether, during the pretrial hearing on a motion to suppress, the trial court erred in allowing the prosecution's cross-examination to exceed the scope of the direct examination; (2) whether defendant was found guilty of murder beyond a reasonable doubt; (3) whether the trial court erred in not allowing defendant to answer a question regarding his specific intent to commit murder; and (4) whether the trial court erred in denying defendant's motion to suppress evidence recovered as a result of the warrantless search of defendant's apartment. We affirm.

On July 15, 1983, defendant was arrested for the murder of Gregory Horn. The evidence of the events up until the time of the shooting is not in dispute. On the evening of July 15, 1983, Gregory Horn was visiting with friends on a rooftop patio located at 7405 W. 60th Place in Summit, Illinois. The building next door, at 7403 W. 60th Place, was owned by defendant's brother, Cletus Gross. Defendant and his mother occupied the first floor of 7403 and the second floor was rented by Horn's girlfriend.

At about 9 that evening, prior to going to 7405 W. 60th Place, Horn had gone into his girlfriend's apartment to take a shower. Defendant testified that he heard Horn going up to the apartment and told him that he didn't belong there as no one was at home. Horn responded that he would go into the apartment whenever he wanted to. Defendant testified that he intended to call the police, but before he could do so, he saw his brother, Cletus, in the backyard. Cletus offered to take care of the situation, and about 30 minutes later went over to 7403 W. 60th Place to talk to Horn. Cletus testified that he and Horn had a conversation during which Cletus asked for Horn's keys to the upstairs apartment. After Cletus told Horn he "had no business there," Horn allegedly began using vulgar language and then hit Cletus twice with his fists, once on the forehead above the right eye and once on his left ear.

The evidence as to what occurred after this point varies. At the hearing on defendant's motion to suppress certain evidence and statements, defendant testified that on the evening of July 15, 1983, he heard a scuffle outside of his apartment. He first stated that he

looked outside and saw his brother, Cletus, fall face down on the sidewalk but later stated that he did not actually see him fall. He testified that he went to help Cletus but could not get over the fence between his property and a neighboring house. He stated that he then went back into his house to call the police, but "did not get the number."

After unsuccessfully trying to call the police, he picked up his gun, which was lying on the air conditioner, and went back into the yard. He stated that he went over to the fence and looked into the alley. He then was grabbed with a "choke lock" by someone who tried to pull him over the fence. He stated that he tried to hit the man over his shoulder. After the person fell to the ground, he went into the house to call the paramedics. He stated that he thought Cletus might be dead and he "knew what was wrong" with the other person. He was unable to reach paramedics due to a problem with his phone and did not know whether Cletus or someone else finally called the police.

Officer John Gieseler testified that he responded to a call that took him to the area of 7403 to 7405 60th Place in Summit. He saw the victim lying in the gangway and was told by Fred Patrick that the offender had gone into the first building east of the gangway. Officers Gieseler, Stancato and Hyde then walked into the building. They knocked on the closed door of defendant's apartment and advised Mr. Gross that there had been a shooting and asked if anyone had come in. Mr. Gross stepped out of the way and walked over to the kitchen table and sat down, leaving the door open.

Officer Michael Stancato testified that the apartment door was open and that he had a conversation with defendant. The defendant stated that he had shot the victim and told the officer where the gun was located. Officer Stancato then recovered the gun from the top of the air conditioner.

Defendant's motion to suppress the gun and the statements made to the police was denied based on the trial court's finding that the entry into defendant's house was consensual and that the gun was retrieved only after defendant informed the officers of its location.

Several hours after the incident, Cletus Gross was interviewed by an assistant State's Attorney in the presence of an attorney representing defendant. During the interview, Cletus stated that Horn struck him on the forehead but that he did not fall down. He told the State's Attorney that after he was hit, he heard a shot. He looked around and saw Horn falling and then turned and saw his brother. He also said that he saw "a big long thing *** in [my] brother's ***" but did not complete the statement.

The testimony Cletus gave at trial varied substantially from the

statement he made the night of the incident. At trial, Cletus testified that after Horn hit him, he flew four or five feet through the air, landed face down on the concrete and lost consciousness for an indeterminate period of time. He described the sound he had heard as an "explosion" rather than a shot and testified that he did not know what the sound was. He also testified that at no time between when he and Horn had their conversation until after the police arrived did he see defendant outside of defendant's apartment.

Cletus also testified that he went to a hospital emergency room the day after the incident but he was told that there was no damage and that he needed no treatment. Officer Stancato, who arrived first at the scene and talked to Cletus upon his arrival, testified at trial that he had observed no apparent injuries to Cletus other than a slight redness around his ear.

At trial defendant testified that he heard a commotion outside and when he went outside saw Cletus come "flying out from between the two houses" and land face down on the sidewalk. Before he went over to Cletus, he went back into his house to get his gun, which he kept on the air conditioner. Defendant denied that he went back to call the police after first observing his brother on the ground.

Carrying his gun, defendant walked over to where his brother was lying. He testified that when he turned to look toward the street, someone grabbed him from behind. He stated that he hit the person by holding his gun in his right hand with his finger on the trigger and swinging it over his left shoulder. The person who was holding him tried to take the gun away by jerking it out of his hand. During the struggle, the gun fired once. After the gun was fired, the hold on him was released and defendant walked back into his apartment. Defendant stated that he knew there were two "bodies" lying on the ground.

Officer Stancato testified that when he arrived at the scene he talked to Cletus, who was standing at the curb. He asked Cletus what had happened but Cletus said he did not know. According to Officer Stancato, the defendant first told the police that he did not know who shot the victim and did not know where the gun was. When asked a second time, defendant admitted shooting the victim and told the officers where the gun was located.

Medical evidence was offered by way of stipulation and revealed that the victim was a 22-year-old male who weighed 210 pounds and was 5 feet 10 inches tall. The pathologist who performed an autopsy on the victim concluded that the victim died from a single gunshot wound to the neck which perforated the trachea and esophagus and lacerated the spinal cord. The bullet coursed from front to back,

slightly right to left, and slightly downward. The defendant testified that he was 64 years old, was about 5 feet 5 inches tall and weighed 275 pounds.

In finding defendant guilty of murder, the trial court noted that there was no evidence that would give rise to a finding of manslaughter, nor was there any justification for the shooting. The trial court also weighed defendant's credibility, and based on the many inconsistencies in the testimony, coupled with the physical and medical evidence, determined that the shooting was not accidental. Defendant now appeals.

■ Defendant's first contention is that the trial court improperly allowed cross-examination of the defendant to exceed the scope of the direct examination at the hearing on the motion to suppress. Defendant maintains that he was prejudiced by this cross-examination because the trial court considered the statements he made during cross-examination in finding him guilty of murder. The State maintains that the cross-examination was proper because it developed the circumstances regarding the officers' appearance at defendant's apartment and explained why it was permissible for them to enter his home without a warrant.

The general rule is that cross-examination is limited to matters covered on direct examination (*People v. DuLong* (1965), 33 Ill. 2d 140, 144, 210 N.E.2d 513); however, the rule is modified to the extent that cross-examination may develop all circumstances within the knowledge of the witness "which explain, qualify, discredit or destroy his direct testimony." (*People v. Perez* (1981), 98 Ill. App. 3d 64, 70, 423 N.E.2d 964, *appeal denied* (1981), 85 Ill. 2d 572.) A defendant who testifies on his own behalf subjects himself to legitimate and pertinent cross-examination, the scope of which rests within the sound discretion of the trial court. *People v. Torres* (1985), 130 Ill. App. 3d 775, 781, 474 N.E.2d 1305.

When a defendant testifies in support of a motion to suppress evidence, his testimony may not subsequently be admitted against him at trial on the issue of guilt but it may be used by the State for impeachment purposes if the defendant chooses to testify at trial. (*People v. Smith* (1978), 67 Ill. App. 3d 952, 958, 385 N.E.2d 707, citing *Simmons v. United States* (1968), 390 U.S. 377, 19 L. Ed. 2d 1247, 88 S. Ct. 967; *People v. Sturgis* (1974), 58 Ill. 2d 211, 317 N.E.2d 545.) What constitutes proper cross-examination is for the court to determine, and its decision will not be disturbed unless there is a clear abuse of discretion which results in manifest prejudice to the defendant. *People v. Burris* (1971), 49 Ill. 2d 98, 104, 273 N.E.2d 605.

Defendant's motion to suppress alleged that the Summit police officers' entry into his residence was illegal because they did not have a warrant to search the premises or to arrest him and because he did not consent to the search of his apartment. At the hearing on the motion to suppress, he testified on direct examination that the police came to his apartment but did not show a search warrant or an arrest warrant. Defendant stated that he opened his door in response to the officers' knock and then sat down beside a table. The officers came into the apartment and defendant told them where he had put the gun. He further testified that he did not give the officers permission to enter his apartment. On cross-examination, over defense objections, the court allowed the prosecution to pursue a line of questioning as to whether the defendant knew why the police were at his home.

Although the questions put to him on cross-examination focused on events occurring prior to the events testified to on direct examination, the questions were all directed toward explaining, qualifying or discrediting his statements on direct examination. That there had been a man killed outside of his house in an incident in which he was involved would explain why the police sought to question defendant and would provide the police with both probable cause and exigent circumstances to enter defendant's apartment. Under these circumstances, we find that the cross-examination of defendant was not improper and that the use of the testimony at trial for impeachment purposes did not constitute an abuse of discretion.

We also find no merit in defendant's contention that the comparative number of pages indicated that the cross-examination was impermissibly broad. It does not follow that because there were five pages of direct examination, the prosecutor should be limited to a certain number of pages of cross-examination. At issue is solely whether the content of the cross-examination was proper. The cases cited by defendant address the question of whether the trial court improperly limited cross-examination and thus do not support his argument here. See *People v. Kilgore* (1976), 39 Ill. App. 3d 1000, 350 N.E.2d 810, *appeal denied* (1976), 63 Ill. 2d 560.

■■ Defendant also contends that he was not found guilty beyond a reasonable doubt of murder because the State failed to prove that he acted with the requisite mental state when he killed Gregory Horn. He asserts that since the State's case was entirely circumstantial and since he presented a reasonable hypothesis of innocence, that hypothesis must be accepted pursuant to *People v. Calhoun* (1972), 4 Ill. App. 3d 683, 690-91, 281 N.E.2d 363.

The State's case included evidence that shortly before the shoot-

ing, defendant's brother, Cletus, had asked Horn to return the keys to his girlfriend's apartment, that witnesses heard a shot, that defendant stated to police that he shot Horn and that the gun was recovered from defendant's apartment. It was undisputed that the defendant shot and killed Horn, and the only issue to be resolved is whether the State established that he did so with the requisite mental state to support a conviction for murder.

A person who kills an individual commits murder not only when he intends to kill another individual, but also when he intends to do great bodily harm, or when he knows that his acts create a strong probability of death or great bodily harm, or when he is attempting or committing a forcible felony. (*People v. Harris* (1978), 72 Ill. 2d 16, 23-24, 377 N.E.2d 28.) In order to prove the crime of murder, it is not necessary to show that the defendant had a specific intent to kill or do great bodily harm or that he knew that his acts would achieve those results. (*People v. Bartall* (1983), 98 Ill. 2d 294, 307, 456 N.E.2d 59.) All that need be proved is that the defendant voluntarily and willfully committed an act, the natural tendency of which was to destroy another's life or inflict great bodily harm. (*People v. Szerletich* (1980), 86 Ill. App. 3d 1121, 1124, 408 N.E.2d 1098.) Intent can be implied or inferred from the character of the act, including the fact that defendant used a deadly weapon. (See *People v. Koshiol* (1970), 45 Ill. 2d 573, 578, 262 N.E.2d 446, *cert. denied* (1971), 401 U.S. 978, 28 L. Ed. 2d 329, 91 S. Ct. 1209.) The question of intent is a question to be resolved by the trier of fact and that finding will not be reversed on appeal unless the finding is inherently impossible or unreasonable. *People v. Johnson* (1979), 70 Ill. App. 3d 149, 153, 388 N.E.2d 225.

In finding the defendant guilty of murder, the trial court noted that any claim of self defense had no merit as there was no threat of imminent harm. The court also found that there was no evidence that would warrant a finding of manslaughter nor was there any justification for the shooting. The court also considered whether the shooting could have been accidental, and determined based on the medical evidence and the inconsistencies in the testimony that the incident would not have occurred in the way defendant claimed it had.

The defendant testified that he took a loaded gun with him to an area where an argument had just occurred. With his finger on the trigger, so that the gun was capable of being instantly fired, he engaged in a struggle with the victim. The court was not bound to believe defendant's story that there was a struggle for the gun or that the gun was fired accidentally. The defendant voluntarily and willfully

committed an act, the natural tendency of which was to destroy another's life or inflict great bodily harm, and the requisite intent to commit murder can be inferred from this act.

Although the defendant was under no duty to prove his innocence, having chosen to explain the death of the victim that only he had knowledge of, "it was incumbent upon him to tell a reasonable story or to be judged by its improbabilities." (See *People v. Neal* (1968), 98 Ill. App. 2d 454, 458, 240 N.E.2d 784.) Unlike the defendant in *People v. Calhoun* (1972), 4 Ill. App. 3d 683, 281 N.E.2d 363, the defendant here has offered no reasonable hypothesis of innocence that would create a reasonable doubt as to his guilt. In *Calhoun*, the physical evidence strongly supported the defendant's contention that the shooting was accidental.

In the instant case, to the contrary, the physical evidence does not support defendant's contention that the killing of Gregory Horn was accidental. Defendant claimed that although Horn was five inches taller than defendant, defendant had a gun held over his left shoulder that fired into Horn's neck and that the bullet took a downward course and traveled slightly right to left as it traveled through Horn's neck. Based on the relative heights of Horn and defendant, it would have been virtually impossible for the bullet to have traveled downward through the victim's neck at that angle.

Defendant's contention that the victim was pulling the gun downward as they struggled over the gun is also not supported by the physical evidence. If Horn had been holding defendant's neck from behind defendant's back and the gun fired into him as defendant held it over his left shoulder while Horn was pulling it downward, the wound would most probably have been in the victim's chest rather than in the middle of his neck.

The testimony of defendant coupled with the medical testimony does not, in our view, support defendant's contention that the shooting was an accident. His claim had to stand or fall on the weight and credibility of his own testimony. (*People v. Neal* (1968), 98 Ill. App. 2d 454, 459, 240 N.E.2d 784.) On the record here, we believe the trial court was warranted in finding that defendant did not present a reasonable or credible defense and that the evidence presented by the State was sufficient to prove him guilty beyond a reasonable doubt.

■ Defendant also contends that he was denied a fair trial because the trial court lost patience with him during cross-examination. During cross-examination, the assistant State's Attorney attempted to impeach defendant with his pretrial hearing testimony. Defendant repeatedly refused to respond to questions in regard to whether he had

made certain statements despite the fact that the trial court explained to him several times that the questions should be answered either "yes," "no," or "I don't remember." After the trial court had admonished defendant for the third time and the defendant still refused to respond, the trial court stated, "I give up."

The defendant cites *People v. Johnson* (1972), 4 Ill. App. 3d 539, 281 N.E.2d 451, to support his contention that reversal is warranted where the trial judge has failed to hear the evidence with an open mind. In that case, the trial judge made a finding of guilt prior to the presentation of all of the evidence. The appellate court reversed, finding that the defendant had been denied a fair and impartial trial. That is not the situation here, where the trial court heard all of the evidence and evaluated it before rendering a decision. Upon reading the record it is clear that the judge did not "give up" on hearing the evidence with an open mind but did give up on admonishing the witness as to the proper manner of answering the questions.

■ Defendant further alleges that the trial court improperly assumed the role of advocate during the trial when he questioned defendant regarding the facts of the shooting. We disagree. After defendant's testimony had been interrupted numerous times because defendant had repeatedly failed to be responsive to questions, the trial court attempted to clarify defendant's testimony. A trial court has the right to question witnesses in order to elicit truth or clarify material issues which seem obscure as long as he does so in a fair and impartial manner. (*People v. Marino* (1953), 414 Ill. 445, 450, 111 N.E.2d 534.) After reviewing the record, we conclude that the trial court did not impermissibly take on the role of prosecutor but merely sought to clarify the evidence. (*Cf. People v. Cofield* (1973), 9 Ill. App. 3d 1048, 1050-51, 293 N.E.2d 692.) Under the circumstances here, we find no abuse of discretion.

Defendant also claims that the trial court erred in not permitting him to testify regarding his specific intent to kill Horn, as the question of intent is a crucial element of the charge of murder. This issue was not raised in the written motion for a new trial and therefore the issue is considered waived. (See *People v. Caballero* (1984), 102 Ill. 2d 23, 31, 464 N.E.2d 223.) In any event, we believe that defendant's claim has no merit. The rejection of evidence is not prejudicial where substantially the same evidence is admitted in another stage of the trial. (*People v. Wallace* (1981), 100 Ill. App. 3d 424, 429, 426 N.E.2d 1017, *appeal denied* (1982), 88 Ill. 2d 554.) In this case, the defendant was asked by defense counsel whether he intended to shoot Greg Horn. The State's objection was sustained. The defendant did testify,

however, that the gun went off accidentally during the struggle, and such testimony necessarily indicates a lack of intent on his part. In light of the fact that defendant was permitted to testify to substantially the same evidence, we find that there was no error.

■ Defendant's final contention is that the entry by police officers into his home was unreasonable because it was neither consensual nor based upon exigent circumstances and therefore the trial court erred in denying his motion to suppress the evidence. The State maintains that the entry was reasonable because it was based on probable cause, defendant consented to the entry and it was based upon exigent circumstances. After reviewing the record, we believe that defendant not only consented to the entry, but that it was based on exigent circumstances.

In a motion to suppress evidence unlawfully seized, the defendant has the burden of proving that the search and seizure were unlawful. (*People v. McNair* (1983), 113 Ill. App. 3d 8, 16, 446 N.E.2d 577, *cert. denied* (1983), 464 U.S. 860, 78 L. Ed. 2d 164, 104 S. Ct. 185.) A warrantless entry is unlawful unless there exist probable cause and either exigent circumstances or consensual entry. (*People v. Calhoun* (1984), 126 Ill. App. 3d 727, 735, 467 N.E.2d 1037.) Probable cause is a reasonable belief that a search of a particular place will disclose evidence, the fruits of the crime, or is necessary for the protection of the police officer. *People v. Hering* (1975), 27 Ill. App. 3d 926, 941-42, 327 N.E.2d 479, *appeal denied* (1975), 60 Ill. 2d 599.

Where the prosecution seeks to rely upon consent to justify the lawfulness of a search, the State must prove by a preponderance of the evidence that the consent was voluntarily given. (*People v. Smith* (1984), 124 Ill. App. 3d 914, 919, 464 N.E.2d 1206.) The consent may be in the form of words, gesture, or conduct. (*United States v. Griffin* (7th Cir. 1976), 530 F.2d 739, 742.) Whether the consent to enter was voluntarily given rather than the result of coercion or duress is a question for the trier of fact and we will not set aside a ruling of the trial court unless it is clearly erroneous. *People v. McNair* (1983), 113 Ill. App. 3d at 16-17, *cert. denied* (1983), 464 U.S. 860, 78 L. Ed. 2d 164, 104 S. Ct. 185.

At the suppression hearing, the defendant testified on direct examination that he did not give the police officers permission to enter his apartment. On cross-examination, he testified that he opened the door for the officers and then went inside and sat down at a kitchen table. The police then followed him into the apartment. He testified that "he wasn't going to stand in the doorway to keep them out."

According to his own testimony, defendant attempted to call the

police and the paramedics. When the police arrived and knocked on his door, defendant opened the door. The officers asked him if anyone had run inside. Defendant did not respond to the question but stated that there was no one home upstairs. He left the door open and walked over to a kitchen table and sat down, at which time the police followed him into the apartment. As they were in the middle of a conversation when defendant walked into his apartment leaving the door open, it was reasonable for the officers to believe that defendant consented to their entering the apartment. Moreover, the officers did not rely on coercion or duress to gain entry into defendant's home. We concur with the trial court's finding that defendant's conduct manifested consent to enter his apartment.

■ In the present case, we believe there were also exigent circumstances which justified the police officers' warrantless entry. (See *People v. Thompson* (1981), 93 Ill. App. 3d 995, 1004, 418 N.E.2d 112, *cert. denied* (1982), 458 U.S. 1109, 73 L. Ed. 2d 1371, 102 S. Ct. 3490.) In order to determine whether exigent circumstances exist, the following factors must be considered:

> "(1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect 'is reasonably believed to be armed'; (3) 'a clear showing of probable cause *** to believe that the suspect committed the crime'; (4) 'strong reason to believe that the suspect is in the premises being entered'; (5) 'a likelihood that the suspect will escape if not swiftly apprehended'; and (6) the peaceful circumstances of the entry." [Citations.] (*People v. Sakalas* (1980), 85 Ill. App. 3d 59, 65-66, 405 N.E.2d 1121, *appeal denied* (1980), 81 Ill. 2d 597.)

These factors need not all be present; the determinative issue is whether the entry was reasonable under the circumstances. *People v. Rimmer* (1985), 132 Ill. App. 3d 107, 114, 476 N.E.2d 1278.

In the present case, when the officers arrived at 7403-05 60th Place, they saw a body lying in the gangway bleeding from the head. People standing near the body stated that the victim had been shot by a person who had gone into the building immediately east of the gangway. The police thus had a strong reason to believe that the suspect was in defendant's apartment and that he was armed and violent. The police acted immediately upon arriving at the scene of a homicide after having received information establishing probable cause. There was not sufficient time to obtain a warrant, under the circumstances. It is also uncontested that the officers entered defendant's apartment peacefully. Based on our finding that exigent circumstances were present here, we conclude that the entry was reasonable.

For the reasons stated above, we affirm the judgment of the circuit court of Cook County. Additionally, pursuant to *People v. Nicholls* (1978), 71 Ill. 2d 166, 374 N.E.2d 194, and *People v. Agnew* (1985), 105 Ill. 2d 275, 473 N.E.2d 1319, we assess defendant $75 in costs for the State's defense of the instant appeal and hereby incorporate it as part of this judgment.

Judgment affirmed.

CAMPBELL, P.J., concurs.

JUSTICE MANNING, dissenting:

I respectfully dissent. It is my opinion that the State came nowhere close to meeting its burden in proving the defendant guilty of murder beyond a reasonable doubt.

The elements of murder are the knowing, intentional and unlawful taking of another's life. (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(a); *People v. Clemens* (1972), 9 Ill. App. 3d 312, 317, 292 N.E.2d 232.) While it is not necessary to show that the accused deliberately formed the intent to kill to justify a conviction for murder (*People v. Davis* (1966), 35 Ill. 2d 55, 61, 219 N.E.2d 468; *People v. Walden* (1976), 43 Ill. App. 3d 744, 752, 357 N.E.2d 232), the least that must be proved is that the defendant voluntarily and wilfully committed an act, the natural result of which would be the death of another. *People v. Calhoun* (1972), 4 Ill. App. 3d 683, 689, 281 N.E.2d 451.

The evidence presented by the defendant was his sworn testimony that Greg Horn grabbed him from behind and in fighting him off, the gun discharged. In my opinion, the State has not presented any competent evidence to contradict the defendant's version of the incident. There are no occurrence witnesses other than the defendant who saw the shooting. The State did not present any forensic evidence to establish either the distance between the victim and the weapon at the time of the shooting or to show that the shooting could not have occurred as the defendant had testified. Rather, the State sought to establish its case on speculation and conjecture. It relies on a vague statement made by the defendant's brother and the fact that the victim was five inches taller than the defendant to establish the defendant's intent to commit murder.

The statement attributed to the defendant's brother, Cletus, that while in a dazed state he heard a shot, looked and saw the victim falling, turned around and saw a "big long thing," was introduced only as impeachment of his testimony at trial. Let us examine what im-

peachment actually occurred. Cletus testified at trial that after he was hit, he was "semi-unconscious and semi-conscious"; previously he had stated that he had been in a daze. At trial he testified that he heard an explosion; he allegedly described the noise to the assistant State's Attorney on the date of the shooting as a gunshot. Up to this point, the testimony is not necessarily inconsistent with his prior oral statement. The sole possible inconsistency is between his testimony at trial that when he looked up nobody was there and the oral statement which he allegedly gave the assistant State's Attorney indicating that he saw his brother when he looked up, even though at trial he did not remember making such a statement.

While there is no issue raised in this appeal regarding use of prior inconsistent statements, I consider it only in my analysis of the evidence herein for the purpose of determining if there is competent evidence in this record sufficient to sustain this conviction beyond a reasonable doubt.

Prior inconsistent statements may be admissible as substantive evidence if: (1) the statements are inconsistent with testimony at trial (2) the witness is subject to cross-examination; (3) the statements are within the personal knowledge of the witness; and (4) the statements are acknowledged under oath or have been electronically recorded. (*People v. Hastings* (1987), 161 Ill. App. 3d 714, 719, 515 N.E.2d 260; Ill. Rev. Stat. 1985, ch. 38, par. 115—10.1.) Cletus' statement, however, does not meet these requirements. He did not recall making the statement and the State did not introduce a recording of the alleged statement into evidence at trial nor was it in writing. Thus, while the statement may have been properly used to impeach the witness' credibility, it was not admissible as substantive evidence. The trial court correctly admitted it for nothing more than impeachment. In light of that, however, it is my judgment that the dearth of sufficient evidence to sustain a criminal conviction beyond a reasonable doubt is in this case readily apparent.

I further disagree with the trial court's conclusion and the majority's view that based upon the trajectory of the bullet and the height of the parties, the physical evidence does not support the defendant's version of the shooting. Again, there is no opinion testimony in the record, expert or otherwise, upon which this conclusion could be based or inferred. It is based solely on speculation and conjecture. It is not unreasonable to believe that during the course of a potentially life-and-death struggle between the 210-pound decedent and the 275-pound defendant, the gun may have discharged into the victim's neck rather than his chest. In fact, the medical evidence presented by the

State establishes that there was stippling on the victim's neck, which is indicative of a close to intermediate range gunshot wound and is consistent with the defendant's story. Knowledge of the distance between the victim and the weapon at the time of firing may have disproved the defendant's claim; however, the State failed to introduce any such evidence.

The majority also holds that the conviction is proper because the only eyewitness, the defendant, was found to be incredible. Although the trier of fact is not obliged to accept the defendant's testimony as true, it should not disregard or reject testimony by the defendant which is not contradicted in its material parts unless it is so unreasonable as to be judged improbable. (*People v. Harling* (1975), 29 Ill. App. 3d 1053, 1059, 331 N.E.2d 653; *People v. Walden* (1976), 43 Ill. App. 3d 744, 749, 357 N.E.2d 232.) Even were the trier of fact to reject the defendant's testimony, the rejection does not have the effect of supplying proof of the defendant's guilt beyond a reasonable doubt sufficient to sustain a conviction. (*People v. Jordan* (1954), 4 Ill. 2d 155, 163, 122 N.E.2d 209.) The trial court's rejection of the defendant's testimony that the shooting was an accident does not constitute evidence for the State that the defendant knowingly and intentionally shot the decedent. The State must prove the defendant's intent, and in my opinion, it has not done so. The evidence presented by the State merely established that the defendant shot Greg Horn, not that the defendant killed him with the requisite mental state. The weakness of the defense does not relieve the State of its burden of proving its case beyond a reasonable doubt. I believe the evidence presented by the defendant has neither been contradicted in its material parts by competent evidence on the part of the State, nor is it so implausible that it should be completely disregarded by the trier of fact. The State has the burden of proof and it has failed to sustain it. In my view, the evidence in its totality is insufficient to establish the defendant's guilt beyond a reasonable doubt.

Based upon the foregoing, I would reverse the defendant's conviction.